NUGENT, J.S.C.
*261 *542 In this medical malpractice action, plaintiffs appeal from an order that denied their motion for a new trial.[1] The jury rejected plaintiffs' claim that defendant Dr. Jack Goldberg's management of plaintiff T.L.'s blood disorder fell below medical standards of care when he prescribed a drug that should not have been prescribed for a patient with her medical history.[2] We conclude defense counsel's failure to discharge his duty of candor to the court and counsel by disclosing that defendant's trial testimony would differ materially from defendant's certified interrogatory answers and sworn deposition testimony resulted in plain error that deprived plaintiffs of a fair trial. We thus reverse and remand for a new trial.
*543 I.
A.
This action's procedural history began in 2011 when plaintiffs filed a complaint against defendant and others. Plaintiffs alleged defendant was liable for his medical negligence in prescribing a new drug, Pegasys, to manage plaintiff's blood disorder. Plaintiff's ingestion of the drug allegedly caused her to develop a severe neurological condition, which resulted in partial paralysis of her right side. Defendants answered and denied deviating from any standard of care. They also denied that plaintiff's use of Pegasys caused the neurological condition she developed.
During discovery, defendant certified in an interrogatory answer that he did not recall relying upon any medical text or publication in connection with his diagnosis or treatment of plaintiff. When deposed, defendant denied being aware of any studies in the Journal of Clinical Oncology pertaining to the use of Pegasys to treat patients with the blood disorder that afflicted plaintiff.
Plaintiff presented a list of motions in limine when trial began. Among such motions, plaintiff moved "[t]o bar defendants from utilizing medical literature at the time of trial," because defendant had provided none in response to discovery requests. Based on defense counsel's representation that he intended to use only the medical literature "referred to and relied upon by plaintiff's witnesses," the court granted the motion.
The trial began on March 30, 2015. On April 24, 2015, by agreement of six jurors with a seventh disagreeing, the jury returned a verdict for defendant. In response to the first question on the verdict sheet, the jury found defendant had not deviated from the relevant standard of *262 care. Plaintiffs filed a motion for a new trial, which the trial court denied. This appeal followed. *544 B.
The parties developed the following proofs at trial. In 2003, doctors diagnosed plaintiff with a blood disorder, essential thrombocythemia (ET).[3] According to the medical witnesses, ET occurs when stem cells in the bone marrow, which divide and "give birth to" red blood cells, white blood cells, and platelets, overproduce platelets. Platelets aid blood clotting. In a person with ET, the platelets rapidly proliferate. If left unmanaged, ET can significantly increase the risk of life-threatening clotting and bleeding. A normal platelet count is no more than 300,000. An abnormal platelet count in a person with ET averages around one to two million.
Plaintiff's pre-ET medical history included a 1996 work-related accident in which she sustained a crush injury to her left shoulder, after which she developed a condition known as sympathetic reflex dystrophy. In 1997, she underwent surgery involving her cervical and lumbar spine following an automobile accident. Relevant to the issue of whether defendant should have prescribed Pegasys for plaintiff, plaintiff also had a history of depression.
Following her diagnosis of ET in 2003, plaintiff came under the care of a hematologist, Dr. George Karp. In January 2005, after conferring with two other specialists, plaintiff came under defendant's care. Defendant managed plaintiff's ET exclusively from her first visit in January 2005 until he prescribed Pegasys on October 21, 2010, her last office visit with him.
When doctors first diagnosed plaintiff with ET, the condition was generally managed with aspirin and one of three medications: anagrelide, interferon, or hydroxyurea,[4] all of which produced side effects. Dr. Karp started plaintiff on anagrelide. Plaintiff developed *545 serious reactions to anagrelide, and the doctor discontinued its use.
Dr. Karp next prescribed interferon. Plaintiff experienced severe side effects, including flu-like symptoms, nausea, and dizziness. She became so fatigued she was nearly bedridden. Dr. Karp discontinued interferon after a trial period of a few months.
After discontinuing interferon, Dr. Karp prescribed hydroxyurea. Although plaintiff experienced side effects from this drug, she tolerated it better than she had tolerated the anagrelide and interferon. Plaintiff took hydroxyurea for nearly six years, from late 2004 until October 2010, when defendant prescribed Pegasys.
According to one medical expert, Pegasys is a slow-release type of interferon. The expert explained that when plaintiff was given interferon originally, it had to be given often, because it does not stay in one's body very long. Pegasys implicates a term called pegylated, "which is a molecule that's added and it gives a slow absorption." The expert added, Pegasys is "like taking a slow release tablet of any medication."
Although plaintiff's husband insisted she should not take Pegasys due to the devastating side effects she had experienced on interferon, defendant urged plaintiff to try Pegasys. He did not believe her previous intolerance of interferon was disqualifying. Plaintiff testified she weighed her concerns *263 about the risk of leukemia from hydroxyurea and the potential for resolving her ET symptoms with Pegasys, as explained by defendant. She ultimately decided to try the drug.
Although defendant initially prescribed four 180 microgram dosages, he had plaintiff start a trial period by injecting only 80 micrograms each week. She administered three doses of Pegasys. According to plaintiff, after she administered the first dose she began to experience flu-like symptoms, as well as dizziness and numbness and tingling on the right side of her body. Her husband reported the reaction to defendant, but he said they needed to give her body time to adjust, so she administered two more doses.
*546 Plaintiff testified that after each dose she experienced the same side effects. Each time that happened, her husband phoned and informed defendant of her reaction. A subsequent blood test revealed plaintiff's platelet levels had fallen, but her white blood cell count had fallen as well.
Concerned about the white blood cell count, plaintiff discontinued Pegasys after the third dose. Plaintiff had taken the three doses during the first three weeks of November 2010. She and her family were scheduled to start a vacation in Jamaica on November 27. The day they arrived, plaintiff received word her father had died. She and her family returned home the next day.
Following her father's funeral, plaintiff sought treatment from two psychologists. Neither recommended medication for her depression, and she took none.
In December, plaintiff began to experience intense migraine headaches. The headaches were accompanied by an "aura" which caused plaintiff to lose partial vision in her left eye and experience numbness in the left side of her tongue, face, and left hand. She went to the emergency room on December 13, 2010. The emergency room doctors had her undergo a CT scan and afterward told her she had a severe migraine and should see a neurologist. Plaintiff saw a neurologist who prescribed Medrol. The Medrol relieved the headaches.
On December 26, 2010, plaintiff began to experience severe neck pain, which radiated down both arms. She applied heating pads to her arms and went to bed. The next day, after resting on the couch, she could not get up. She thought she was paralyzed. Her husband called an ambulance, which transported her to JFK Medical Center.
Plaintiff remained at the medical center for a week and then transferred to a rehabilitation center where she remained for approximately three more weeks. Doctors eventually diagnosed *547 her with transverse myelitis.[5]
Plaintiff testified she began to regain some movement on her right side after steroids administered to her "started to work." While at the rehab center, she also took part in daily occupational and physical therapy. During therapy, she suffered a partial dislocation of her right shoulder. Upon discharge, her movement remained limited. Plaintiff testified she required a wheelchair or walker in order to get around. While plaintiff regained some *264 movement in her right side, she continued to experience weakness in her right arm and right leg.
The parties presented experts with differing opinions as to whether defendant deviated from the applicable standard of care. Plaintiff's expert, Dr. Louis Aledort, a specialist in hematology, testified defendant deviated from the relevant standard of care by prescribing Pegasys for plaintiff. Dr. Aledort explained plaintiff's intolerance to interferon had been well noted, so much so she had sought a second opinion concerning her intolerance. In addition, Dr. Aledort noted that a history of depression alone is a reason not to start somebody on Pegasys, because one can become profoundly depressed from the drug even with no previous history of depression. Plaintiff had a history of depression, a fact of which defendant was aware. More importantly, there was no medical reason to start plaintiff on Pegasys because she was being well maintained on hydroxyurea at the time. According to Dr. Aledort, the appropriate therapy for her ET would have been to continue her on hydroxyurea.
*548 Defendant's expert, Dr. Azra Raza, a hematologist and oncologist, testified defendant did not deviate from a medical standard by recommending and prescribing a trial of Pegasys. Dr. Raza explained doctors treating ET always face the quandary of whether a patient's symptoms are due to the disease or the drugs. In such situations, doctors must balance and decide what is worse: the disease or symptoms from the drugs used to control the disease. The ultimate goal is to strike a balance and provide a patient with the best quality of life possible under the circumstances.
Dr. Raza testified that in October 2010, plaintiff's platelet count had exceeded one million, which was dangerously high. Plaintiff was not tolerating the hydroxyurea well during this time and she was using it intermittently. Given these circumstances, it was appropriate to try something else, and Pegasys was available. Dr. Raza opined defendant appropriately started plaintiff's Pegasys trial with low doses to monitor the side effects.
Dr. Raza did not agree plaintiff's ET was controlled by hydroxyurea over the years. Plaintiff's platelet count was up and down for two reasons: her intolerance to hydroxyurea, and her refusal at times to take it due to the symptoms she ascribed to the drug. The doctor did not believe plaintiff's psychological history was a contraindication to prescribing Pegasys. She explained that it was certainly necessary for both defendant and plaintiff to be aware of the "black box" warnings on the drug. According to the doctor, however, defendant and plaintiff had extensive discussions about such warnings. Dr. Raza also opined plaintiff had been less tolerant of hydroxyurea than the interferon that she had taken after her blood disorder was first diagnosed. Dr. Raza did not believe the Pegasys caused plaintiff's transverse myelitis.
The parties also presented experts with opinions about causation. Plaintiff's expert neurologist, Dr. Martin Gizzi, opined plaintiff's right-sided weakness or paralysis was caused by the transverse myelitis, which in turn was caused by Pegasys. Dr. Gizzi *549 further opined the conditions caused by plaintiff's transverse myelitis were permanent.
Defendant's expert neurologist, Dr. Terry Heiman-Patterson, disagreed with Dr. Gizzi. Dr. Heiman-Paterson acknowledged plaintiff had suffered an injury to her spinal cord but opined Pegasys did not cause the injury.
Dr. Barbara Ziv, a psychiatrist, testified for the defense. Dr. Ziv testified that many *265 of plaintiff's symptoms were inconsistent with a physiological cause and were likely a result of a combination of somatization disorder and conversion disorder.
Dr. Ziv diagnosed plaintiff with somatization disorder and conversion disorder based on multiple factors, including an examination, a review of plaintiff's medical and personal history, and a Minnesota Multiphasic Personality Inventory (MMPI)[6] . Dr. Ziv explained that somatization disorder is essentially the physiological manifestation of psychological and emotional stresses. She explained that conversion disorder is a condition characterized by the development of signs and symptoms of neurological problems such as paralysis, weakness, or numbness as a result of a psychological issue. Dr. Ziv opined plaintiff's conversion disorder caused her paralysis. The doctor acknowledged plaintiff had lesions on her spinal cord, but testified the lesions did not fully account for plaintiff's symptoms.
During her testimony, Dr. Ziv recounted numerous details regarding plaintiff's relationships with her parents, siblings, and son. She explained these facts were relevant to her diagnosis:
[I]n order to find out who somebody is from a psychiatric or psychological point of view, you need to start at the beginning, you need to understand where they came from, what forces shaped them as an individual.
And you ... can't just have somebody come into your office and say ["]here are my complaints["] without understanding the context in which those complaints present.
....
*550 So, I asked [plaintiff] about her childhood and the forces that shaped her.
Dr. Ziv also recounted at length the content of numerous medical records and reports, often emphasizing remarks in such documents that cast plaintiff in a bad light. Among other things, Dr. Ziv opined plaintiff was at times malingering and benefitting from secondary gain.
Defendant was the last witness to testify at trial. He testified plaintiff's symptoms had been managed with hydroxyurea, but she was concerned about the drug's role in potentially increasing the risk of leukemia. Despite defendant telling plaintiff the risk was very low, plaintiff had begun to take the hydroxyurea intermittently. Defendant noted interferon had been generally effective in treating myeloproliferative diseases, that is, disorders of the bone marrow in which the stem cells of the bone marrow mutate, causing overproduction of white blood cells (leukemia ), platelets (ET), or red blood cells (P-vera).
Defendant explained that Pegasys was designed to be longer lasting and require fewer doses than interferon. In addition, it had fewer side effects and proved more effective than the older interferon. Defendant was unaware of any medical literature linking Pegasys with transverse myelitis.
While explaining his decision to prescribe Pegasys, defendant relied heavily on, and testified extensively about, a published medical article. He did not produce the article; rather, he explained its contents. We digress to provide the broader context of his testimony in terms of pre-trial discovery and the court's in limine rulings.
During discovery, defendant certified the following interrogatory answer:
*266 [Interrogatory]. Did you refer to or rely upon any medical texts or publications in connection with the diagnosis or treatment of plaintiff? If so, identify those items by title, author and publisher.
[Answer]. Not to the recollection of [a]nswering [d]efendant.
During depositions, the following exchange took place between defendant and plaintiff's counsel:
*551 Q: Are you aware of any studies in the Journal of Clinical Oncology pertaining to the use of [Pegasys] to treat patients with ET and PD?
A: No.
Q: In that such studies excluded patients who had a history of depression; are you aware of that?
A: No.
Plaintiff made several in limine motions when the trial began. In one motion, she moved "[t]o bar defendants from utilizing medical literature at the time of trial." Her attorney argued he had provided "certain learned treatises" during discovery, but defendants had provided none. He wanted to be sure he was "not going to be seeing any as the case proceeds because [he had not] been given notice of any." Defense counsel responded:
The only medical literature that's going to be used in the course of the defense in this case is the medical literature that's been referred to and relied upon by plaintiff's witnesses on cross-examination and as may be necessary during any direct testimony. But it's his literature that we're gonna be talking to the jury about.
The trial court granted the motion, stating, "so actually I'm barring you from using any additional medical literature that has not been provided during the course of discovery." Defense counsel acknowledged the ruling: "Yes, Your Honor."
Notwithstanding defendant's interrogatory answer and deposition testimony, the trial court's verbal order, and defense counsel's representation, when asked on direct examination about his decision to prescribe Pegasys, Dr. Goldberg referenced clinical trials from 2005 published in 2009 in the Journal of Clinical Oncology, though he didn't identify a specific article:[7]
Q: Let me ask you a question, doctor. When you prescribed Pegasys for [plaintiff] in October of 2010, were you some kind of a maverick using [Pegasys]? Was this a way out or new, experimental thing by you?
*552 A: I don't think so.
Q: Why is that?
A: And the reason for that is that for a couple things that happened. Number one, [Pegasys] really took over what was previously interferon. It started with hepatitis C. Interferon was no longer used. It went over to other indications for interferon like malignant melanoma, and it was starting to be used very importantly to another disease, myeloblastic disease, called chronic myelogenous leukemia.
In 2005, the investigators at M.D. Anderson took [Pegasys] and tested it in a clinical trial to patients with ET, essential thrombocythemia, and P-vera.
*267 2005. In 2009 they reported their information from the clinical trial ongoing in an article in the Journal of Clinical Oncology.
Q: Was that part of what you were using in-in your prescribing Pegasys? Were you looking at things like that?
A: Absolutely. And furthermore, as you heard the-the M.P.V. Foundation ... carried all the news and information about Pegasys and Pegasys now became a very hot word, because the data in 2009 was Pegasys works. Pegasys is well-tolerated. And Pegasys can maybe reduce this disease. So, you may not need treatment again. That was in 2009.
....
Q: ... [D]idn't [plaintiff's] prior experience with the older form of interferon and her prior history of-of depression, ... disqualify her from Pegasys in 2010?
A: No, absolutely not.
Q: And briefly, why?
A: Very briefly, the clinical trial in 2005 that was produced and done by M.D. Anderson included patients with depression. They included patients who had depression, who were reactive depression. They were included in the trial. They were not excluded. The only patients that were excluded were major depression, not controlled. That was not [plaintiff].
Next, the clinical trial that was done in-that was done in 2005 that continued to 2000 [sic]-and presented in 2009, the patients with ET were bad ETs. They had problems. They had been on anagrelide. They had been on Hydrea. And guess what. They were on interferon. And so they were treated, re-treated, this time with Pegasys and those were the-and I-and I can go through the results of that trial.
So that influenced me to make that-or bring up the option, not to demand that was the treatment.
[Emphasis Added.]
Defendant reiterated that the study's results, which suggested Pegasys might be an effective treatment for ET, were published in the Journal of Clinical Oncology in 2009. With regard to the ultimate decision to use Pegasys, Defendant explained:
I told [plaintiffs] about Pegasys and [M.L.'s] response was [plaintiff] had interferon before. I don't want it. I-I'm voting against it. At that point I said look, I-I don't know if we can even get the medication, but why don't you read about it. This is the *553 data that was published in 2009. I-I discussed the results of that. I talked to her. I told her that, you know, there's data suggesting that maybe you could get off the medication at some time in the future. That's what the future prospects of this clinical trial suggested. And so, he voted against it.
So, I said look, go home. I want you to go ... and read about it and investigate it, which she did many times [in] other instances. And then, a week later, she called and said [she] got the medication.
Defendant further explained plaintiff's prior interferon intolerance did not disqualify her from a trial treatment with Pegasys. He stressed her intermittent depression was not a "contraindication" to prescribing Pegasys. According to defendant, it was appropriate to exercise caution in prescribing Pegasys to patients suffering from endogenous depression, but plaintiff suffered only from secondary depression. Defendant noted plaintiff had not been taking any medication for depression when he prescribed Pegasys and she was doing well.
Plaintiff did not object to defendant's reference to the article. She did not raise any issue about the material differences *268 between defendant's discovery responses and trial testimony until she made her motion for a new trial.[8]
The jurors did not reach the questions on the verdict sheet concerning the cause of plaintiff's injuries and damages, because in a six to one vote they found defendant had not deviated from the applicable standard of care.
II.
A.
On appeal, plaintiffs argue the trial court erred by denying their motion for a new trial. Specifically, plaintiffs contend the following *554 alleged errors, considered individually or cumulatively, warrant a new trial: defendant's surprising and misleading testimony about the medical article he previously denied knowing about; defense counsel's improper cross-examination concerning her husband displaying a gun in the automobile accident in which plaintiff was injured; and the defense psychiatrist's multiple references to inadmissible and prejudicial evidence, as well as her expressing opinions in areas for which she had not been qualified as an expert.
We first address plaintiff's argument that she is entitled to a new trial because contrary to defendant's interrogatory answer, his deposition testimony, the trial court's order, and defense counsel's representation, defendant testified at trial he relied on a medical article when he prescribed Pegasys for her. Plaintiff also contends defendant made false statements about the contents of the article, particularly as to the exclusion criteria for patients who had a history of depression and who had previously reacted adversely to interferon.
Defendant emphasizes plaintiff did not object to his testimony. He contends he did not violate the trial court's in limine order because, fairly construed, it pertained to learned treatises relied upon by experts, and he was not testifying as an expert. He also argues that because he was testifying solely as a fact witness concerning his recollection of plaintiff's treatment and not as an expert offering an opinion on the standard of care, any error was harmless.
In its decision denying plaintiff a new trial, the trial court acknowledged plaintiff's argument that defendant testified in violation of the court's own order barring him from utilizing any medical literature at trial. Yet, the court did not specifically address that issue in its opinion. Rather, the court found no impropriety in defendant's testimony. The court noted defendant "did not specifically cite to the 2009 article or reference any specific medical studies such to create a miscarriage of justice under the law."
*555 The trial court noted defendant's "testimony regarding [p]laintiff's treatment, his understanding of the Pegasys clinical trials, and ongoing treatment at the time with [p]laintiff all arose from questions he was asked about concerning his decisions for treating [p]laintiff." The court also noted defendant "testified as to his knowledge" when he prescribed Pegasys for plaintiff "that the medication was the subject of on-going clinical trials" which "had been favorable for patients." None of *269 those reasons addressed the material difference between defendant's trial testimony and pre-trial averments, defense counsel's disclosure obligations, or relevant precedent concerning the remedy for such non-disclosure.
B.
Our review of the trial court's denial of plaintiff's motion for a new trial is guided by well-settled principles. "A jury verdict is entitled to considerable deference and 'should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice.' " Hayes v. Delamotte, 231 N.J. 373, 385-86, 175 A.3d 953 (2018) (quoting Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521, 20 A.3d 1123 (2011) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 597-98, 379 A.2d 225 (1977) ) ). For that reason, "a trial court ... grants a motion for a new trial only 'if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law.' " Id. at 386, 175 A.3d 953 (quoting Crawn v. Campo, 136 N.J. 494, 511-12, 643 A.2d 600 (1994) ). Our standard of review of a party's appeal from a trial court's decision on a motion for new trial "is the same as that governing the trial judge-whether there was a miscarriage of justice under the law." Ibid. (quoting Risko, 206 N.J. at 522, 20 A.3d 1123 ).
When we evaluate a trial court's decision to grant or deny a new trial, we "give 'due deference' to the trial court's 'feel *556 of the case.' " Ibid. (quoting Risko, 206 N.J. at 522, 20 A.3d 1123 (quoting Jastram v. Kruse, 197 N.J. 216, 230, 962 A.2d 503 (2008) ) ). That said, we are not bound by a trial court's legal reasoning. "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, LP v. Twp. Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995).
C.
We begin with the material difference between defendant's discovery responses and trial testimony. In his certified interrogatory answer, defendant averred he had no recollection of referring to or relying upon medical texts or publications in connection with his diagnosis or treatment of plaintiff. He confirmed as much in his deposition testimony when he answered flatly, "no," to the question of whether he was aware of any studies in the Journal of Clinical Oncology pertaining to the use of pegylated interferon to treat patients with ET. He also denied knowing such studies excluded patients with depression.
Not wanting to leave the issue to chance, plaintiff moved in limine and obtained a verbal order barring defendant from referencing medical literature during the trial. Despite defendant's averments and the court's in limine order, during his direct testimony defendant not only claimed to have relied on the 2009 article in the Journal of Clinical Oncology, but also erroneously explained some of its contents.
Aside from a party's obligation to amend his interrogatory answers, "defense counsel [has] a continuing obligation to disclose to the trial court and counsel for plaintiffs any anticipated material changes in a defendant's or a material witness's deposition testimony."
*270 McKenney v. Jersey City Med. Ctr., 167 N.J. 359, 371, 771 A.2d 1153 (2001).[9] In McKenney, the court explained, "[l]awyers *557 have an obligation of candor to each other and to the judicial system, which includes a duty of disclosure to the court and opposing counsel." Ibid. (citing Kernan v. One Wash. Park Urban Renewal Assocs., 154 N.J. 437, 461-67, 713 A.2d 411 (1998) (Pollock, J., concurring) ). The Court emphasized the importance of a lawyer discharging his obligation to disclose anticipated material changes in a client's or material witness's testimony:
As Justice Douglas wrote, "discovery and pretrial procedures make a trial less a game of blind man's [bluff] and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." United States v. Proctor [Procter] & Gamble Co., 356 U.S. 677, 683, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958). "Modern litigation is too time consuming and expensive for courts to tolerate discovery abuses. For over fifty years courts have endeavored to transform civil litigation from a battle royal to a search for truth." Kernan, 154 N.J. at 467, 713 A.2d 411 (Pollock, J., concurring).
[ McKenney, 167 N.J. at 372, 771 A.2d 1153 (alteration in original).]
In the case before us, as in McKenney, disclosure by defendant of his anticipated change in testimony was mandatory. Ibid.
In discussing the appropriate remedy for a defendant's nondisclosure of an anticipated material change in testimony, the Court in McKenney noted, "[f]or plaintiffs to proceed to trial without being informed of the surprise testimony create[s] a ' "make believe" scenario [for plaintiffs], the legal equivalent of half a deck.' " Id. at 375-76, 771 A.2d 1153 (first and third alterations in original) (quoting Buckley v. Estate of Pirolo, 101 N.J. 68, 79, 500 A.2d 703 (1985) ). The Court further noted, "[p]laintiffs went to trial misled by false information. Hence, the failure to grant a *558 mistrial was an abuse of discretion." Id. at 376, 771 A.2d 1153 (citations omitted).
We reach the same conclusion here concerning the denial of plaintiff's motion for a new trial. Lawyers and parties should be able to rely on the averments and sworn deposition testimony of witnesses and other parties. Those of our State's lawyers who routinely prosecute and defend medical malpractice actions are among the most skilled trial counsel. But, with some exceptions, they are not doctors. They need to rely on the assistance of their medical witnesses and experts to prepare their direct and cross-examinations. In the case before us, plaintiff was deprived of that opportunity as to defendant's testimony concerning the study and article, which directly implicated one of the action's central issues: whether defendant conformed to or deviated from the applicable standard of care. We also note the jury's verdict was not unanimous and a different vote by one majority member would have changed the trial's outcome.[10]
*271 Defendant stresses plaintiff's attorney did not object to the testimony or seek relief at trial. The silence is inexplicable.[11] Yet, even if counsel decided for strategic reasons not to object at trial, *559 the absence of an objection is not dispositive of whether the client has been prejudiced by improper testimony. Szczecina v. P.V. Holding Corp., 414 N.J. Super. 173, 185, 185 n.5, 997 A.2d 1079 (App. Div. 2010). Moreover, the entire issue would have been avoided had defense counsel discharged his obligation of candor to the court and plaintiff's counsel. Defendant's undisclosed, material change in testimony was plain error. R. 2:10-2. The plain error requires a new trial. McKenney, 167 N.J. at 375-76, 771 A.2d 1153.
III.
A.
Because this case must be retried, we address plaintiff's other allegations of error. We first address defense counsel's question of a witness during cross-examination, and Dr. Ziv's mention during her testimony, of plaintiff's husband displaying a weapon in the immediate aftermath of an automobile accident in which plaintiff had been injured. The issue warrants little discussion. Counsel's question and the expert's statement about the event were improper. The trial court sustained an objection and gave a curative charge. The reference to the gun was not remotely relevant to the issues being tried, had no probative value, and had no place in the trial. We trust defense counsel will not repeat the impropriety. Nonetheless, before the psychiatrist testifies at the retrial, defense counsel should assure the court he has instructed his witness accordingly. Alternatively, the trial court can issue an appropriate directive to the witness.
B.
Plaintiffs argue Dr. Ziv's testimony was replete with improper and unduly prejudicial statements and opinions. Plaintiffs cite the following as examples. Dr. Ziv described the relationship between plaintiff and her adult son as "very enmeshed" and "curious," specifically citing when plaintiff first developed symptoms of right-side paralysis "she was lying on the couch with her *560 son." Doctor Ziv testified plaintiff was "somewhat passive dependent and demanding in relationships," and while she "appear[ed] to be skillful at handling social relationships, she tend[ed] to be rather immature, superficial, and unskilled with the opposite sex." The doctor characterized as "bizarre" an event plaintiff related about suffering from irritable bowel syndrome following someone putting crushed glass into her drink at a restaurant. *272 Dr. Ziv also stated plaintiff had "a very long history of seeking medical attention for a wide variety of vague complaints that, by and large, don't have a physiologic basis." She said that when a physician's assessment did not comport to her views, plaintiff often "doctor shop[ped]" until she found a doctor that would validate her complaints. As previously mentioned, when discussing plaintiff's previous car accident, Dr. Ziv testified plaintiff's husband exited the car with his gun, scaring the passengers in the other car.
With few exceptions, plaintiff's counsel lodged no objections. In view of our determination that defendant's failure to disclose the anticipated material change in his testimony constituted reversible error, we need not address whether, absent objection, portions of Dr. Ziv's testimony were so prejudicial that a new trial is required. In the event plaintiff files a motion in limine and seeks to exclude portions of the expert's testimony, the scope of the expert's testimony can be addressed at a hearing under N.J.R.E. 104.
Such a hearing, if requested, will be needed. Despite the expert's testimony that she no longer treated certain patients, was not an expert in hemotology, no longer saw patients for ET, and had no experience with patients who have suffered side effects from Pegasys, she volunteered numerous opinions that arguably required expertise within all of these areas. Further, based on the proposition that everything in a person's background is relevant to a psychiatric evaluation, she made numerous statements about plaintiff, many of which were either irrelevant or excludable under N.J.R.E. 403. In view of the incompatibility in many instances of Dr. Ziv's view of what is psychiatrically relevant with legal principles *561 of what is relevant or unduly prejudicial, her testimony must be carefully circumscribed.
We have long held that expert testimony generally, and N.J.R.E. 703 specifically, should not be used as "a vehicle for the wholesale [introduction] of otherwise inadmissible evidence." State v. Vandeweaghe, 351 N.J. Super. 467, 481, 799 A.2d 1 (App. Div. 2002) (alteration in original) (quoting State v. Farthing, 331 N.J. Super. 58, 79, 751 A.2d 123 (App. Div. 2000) (citation omitted) ). More recently, in James v. Ruiz, we noted though N.J.R.E. 703 permits an expert to "apprise the trier of fact of the bases for his or her opinion, including the opinions of other experts," the Supreme Court has explained the rule "does not 'entitle a litigant to introduce an out-of-court expert's report for its "truth" where it is critical to the primary issue in the case and the adversary objects.' " 440 N.J. Super. 45, 65, 111 A.3d 123 (App. Div. 2015) (quoting Agha v. Feiner, 198 N.J. 50, 67, 965 A.2d 141 (2009) ).
The Supreme Court has recently reiterated that N.J.R.E. 703 does not authorize an expert to "alert[ ] the jury to evidence it would not otherwise be allowed to hear." Hayes, 231 N.J. at 392, 175 A.3d 953 (alteration in original) (quoting State v. Burris, 298 N.J. Super. 505, 512, 689 A.2d 860 (App. Div. 1997) ). In Hayes, the Supreme Court found the trial court had "erred in permitting [a defense expert witness] to bolster his testimony using 'congruent' opinions in reports of non-testifying doctors during the first trial rather than simply explain the sources of information used in formulating his opinion." Id. at 393, 175 A.3d 953.
Lastly, we note our recent prohibition, generally, on an expert's use of terms such as malingering and secondary gain. Rodriguez v. Wal-Mart Stores, Inc., 449 N.J. Super. 577, 593-94, 159 A.3d 914 (App. Div.), certif. granted, 230 N.J. 565, 170 A.3d 338 (2017).
*273 During the lengthy defense psychiatric testimony, virtually all of the foregoing legal precepts were violated. We emphasize we do not fault the trial court. Plaintiff's counsel objected to virtually none of Dr. Ziv's testimony. We have highlighted these issues to provide guidance to the lawyers and the court in the event *562 plaintiffs timely file a focused motion in limine when the case is retried.
Reversed and remanded. We do not retain jurisdiction.

We use plaintiffs' initials to protect their privacy.

For ease of reference, and because plaintiff M.L.'s claim is derivative, we refer to T.L. as "plaintiff." For similar reasons, we refer to Dr. Goldberg as "defendant."

During the trial, the attorneys and witnesses also referred to the disorder as essential thrombocytosis.

Counsel and witnesses also referred to this medication by its brand name Hydrea.

"Transverse myelitis is an inflammation of the spinal cord, a major part of the central nervous system.... The term myelitis refers to inflammation of the spinal cord ; transverse refers to the pattern of changes in sensation-there is often a band-like sensation across the trunk of the body, with sensory changes below." Transverse Myelitis Fact Sheet, National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Transverse-Myelitis-Fact-Sheet#3 (last visited Jan. 22, 2018).

The MMPI is a 565 question true or false standardized test used to assess the personality and psychological profile of the test-subject.

Defendant has since conceded the article he referenced in his testimony is Alfonso Quintas-Cardama, Hagop Kantarjian, Taghi Manshouri, Rajyalakshmi Luthra, Zeev Estrov, Sherry Pierce, Mary Ann Richie, Gautam Borthakur, Marina Konopleva, Jorge Cortes, and Srdan Verstovsek, Pegylated Interferon Alfa-2a Yields High Rates of Hematologic and Molecular Response in Patients With Advanced Essential Thrombocythemia and Polycythemia Vera, 27 Journal of Clinical Oncology 5418 (2009).

During argument on plaintiff's motion for a new trial, in response to the court's inquiry as to any objection to defendant's testimony about the article, plaintiff's attorney stated: "I didn't object, Judge, because ... I didn't know what the article said, first of all, because I didn't have it. So ... if I objected in front of the jury to that answer, I wasn't sure how they would perceive it. And I didn't have the material to cross-examine the witness on, so I didn't know where to go with it."

Our dissenting colleague distinguishes McKenney on the ground that Dr. Goldberg was not testifying as an expert and his testimony did not come as a surprise. As the Supreme Court's opinion in McKenney makes clear, however, defense counsel has an obligation to disclose anticipated material changes in a defendant's or any material witness's deposition testimony. And though Dr. Goldberg was not designated as an expert, after first recounting his medical credentials, he testified to matters well beyond the ken of the average lay person when explaining why he prescribed Pegasys. We also disagree that Dr. Goldberg's testimony did not come as a surprise to plaintiff; after all, it was contrary to what he said during discovery and contrary to his attorney's representation immediately before the trial began. The change in testimony was disclosed to the court and plaintiff's counsel for the first time during defendant's direct testimony.

For these reasons, we disagree with our dissenting colleague that Dr. Goldberg's testimony was not prejudicial. In addition, the Doctor's material change in testimony from his sworn discovery answers, and the manner in which counsel elicited the trial testimony, suggest they both believed the Doctor's now-claimed reliance on an article he previously disavowed considering or even knowing about was an important factor for their case and for the jury to consider. Moreover, the remedy of a reversal and new trial serves a salient purpose: trial counsel should not be rewarded for violating a duty of candor to the court and other counsel.

Our dissenting colleague believes plaintiff failed to object due to a well-planned trial strategy. We disagree for two reasons. First, we fail to discern how plaintiff could have anticipated Dr. Goldberg would testify at trial contrary to sworn discovery and in violation of a verbal court order, let alone plan and strategize for such an event. Second, our colleague appears to equate plaintiff's knowledge of the medical article with knowledge Dr. Goldberg would change his discovery answers and claim he relied on the article. In our view, the distinction between the two is critical to a plain error analysis of the issue.