SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**T.L. v. Jack Goldberg, M.D. (A-11-18) (081135)**

**Argued February 26, 2019 -- Decided June 10, 2019**

**FERNANDEZ-VINA, J., writing for the Court.**

In this medical malpractice action, the Court considers whether plaintiff T.L. is entitled to a new trial because -- without objection from T.L. -- defendant Jack Goldberg, M.D., gave trial testimony inconsistent with his discovery responses. The majority of a split Appellate Division panel held that T.L. was entitled to a new trial, citing McKenney v. Jersey City Medical Center, 167 N.J. 359 (2001).

T.L. consulted Dr. Goldberg for a blood condition. In October 2010, Dr. Goldberg told T.L. about a new medication, Pegasys. After taking Pegasys, T.L. experienced a number of symptoms, but Dr. Goldberg advised that T.L. should continue taking Pegasys. T.L. began experiencing severe pain in her neck and both arms, requiring hospitalization and rehabilitation. T.L. was diagnosed with inflammation of the spinal cord and experienced partial paralysis on her right side.

In October 2011, T.L. brought suit against Dr. Goldberg and his employer, Penn Medicine Cherry Hill. T.L. claimed that Dr. Goldberg deviated from accepted standards of care by prescribing Pegasys to her because she was diagnosed with, and took medication for, chronic depression. During Dr. Goldberg's deposition, when asked whether he was aware of any studies in the Journal of Clinical Oncology pertaining to the use of Pegasys to treat patients with T.L.'s condition, Dr. Goldberg answered "no." On T.L.'s motion, the court barred Dr. Goldberg from using any medical literature at trial that was not produced during the course of discovery.

At trial, Dr. Goldberg testified that he prescribed Pegasys to T.L. because he relied upon a clinical trial, published in the Journal of Clinical Oncology in 2009, that included patients with a history of depression. T.L.'s counsel did not object. The jury found that Dr. Goldberg did not deviate from the applicable standard of care. T.L. filed a motion for a new trial, arguing for the first time that Dr. Goldberg's discussion of the 2009 publication constituted reversible error. The trial court denied T.L.'s motion.

T.L. appealed, and an Appellate Division majority held that T.L. was entitled to a new trial. 453 N.J. Super. 539, 557 (App. Div. 2018). Citing McKenney, the majority

1

found that Dr. Goldberg materially contradicted his sworn deposition when he testified at trial that he relied on the 2009 publication, and that defense counsel's nondisclosure of that anticipated change in testimony constituted plain error and warranted a new trial. Id. at 556, 558-59.

In dissent, Judge Currier opined that T.L.'s counsel declined to object to Dr. Goldberg's testimony for strategic and tactical reasons, and T.L. thus was not prejudiced by that testimony. Id. at 562, 564 (Currier, J., dissenting).

Dr. Goldberg appealed as of right, based on the dissent. See R. 2:2-1(a)(2).

**HELD:** The circumstances at issue in McKenney, which heavily depended on the prejudice caused to the party disadvantaged by the surprise change in trial testimony, are distinguishable from the change in testimony here. Here there was no demonstration that the changed testimony caused prejudice to T.L., and the plain error standard does not compel reversal, especially because counsel's failure to object was likely strategic. Under the circumstances, T.L. is not entitled to a new trial.

1. In McKenney, the plaintiffs alleged that the defendants failed to provide proper medical care before and during Jannie McKenney's delivery of her son. 167 N.J. at 364-65. The plaintiffs contended that the defendants should have discovered that the fetus had a defect. Ibid. The critical issue was whether Dr. Hu reviewed sonograms on or after August 13, 1990, after which McKenney could no longer obtain a legal abortion. Id. at 366-67, 375-76. During his deposition, Dr. Hu claimed that he likely reviewed the sonograms on August 13 because they were taken where he was then working. Id. at 366. At trial, however, Dr. Hu claimed he did not review the sonograms until after August 13 because they were taken at another medical center. Ibid. The Court observed that Dr. Hu's "change in testimony was critical." Ibid. In addition, Sipra De, a sonogram technician, testified at her deposition that she did not make a notation on one of the sonograms but admitted at trial that she had made the notation. Id. at 367. The Court held that "defense counsel had a continuing obligation to disclose to the trial court and counsel for plaintiffs any anticipated material changes in a defendant's or a material witness's deposition testimony." Id. at 371. The Court found the unanticipated testimony prejudicial because some of De's surprise testimony was extremely beneficial to Dr. Hu; because De's trial testimony inculpated her; and because Dr. Hu's change in testimony was critical to the jury's verdict on causation. Id. at 372-75. Accordingly, the Court held that a mistrial should have been granted. Id. at 376. (pp. 14-17)

2. In an appeal from the denial of a motion for a new trial, courts decide whether there was a miscarriage of justice under the law. When a party specifically argues that a change in testimony warrants a new trial, a court's assessment of the motion is informed by the principles discussed in McKenney. (p. 17)

2

3.  In <u>McKenney</u>, the change in testimony was egregious and clearly prejudicial to the plaintiffs.  Here, on the other hand, Dr. Goldberg's change in testimony was arguably favorable to T.L.'s case because it showed Dr. Goldberg was aware that the 2009 studies indicated Pegasys posed a risk to patients with a history of depression -- and thus T.L.'s counsel's decision not to object was likely strategic.  T.L. has not shown prejudice, and that important and clear difference distinguishes this case from the relief granted in <u>McKenney</u>.  In addition, counsel in <u>McKenney</u> objected to De's change in trial testimony during the trial, and the attorney for the medical centers conceded that he knew De's trial testimony would differ from her deposition.  In all, this case is unlike <u>McKenney</u> and does not require the relief deemed necessary in that matter.  (pp. 17-18)

4.  Nor is T.L. entitled to relief by operation of the plain error standard of review.  As already explained, strategic reasons can be inferred from counsel allowing Dr. Goldberg to testify on the path he proceeded down, and the failure to object itself suggests that it was not perceived to be as fatal as is now argued.  (pp. 18-19)

**The judgment of the Appellate Division is REVERSED**.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, SOLOMON, and TIMPONE join in JUSTICE FERNANDEZ-VINA'S opinion.**

SUPREME COURT OF NEW JERSEY
A-11 September Term 2018
081135

T.L. and M.L.,

Plaintiffs-Respondents,

v.

Jack Goldberg, M.D., and
Penn Medicine Cherry Hill,

Defendants-Appellants.

On appeal from the Superior Court,
Appellate Division, whose opinion is reported at
453 N.J. Super. 539 (App. Div. 2018).

| Argued | Decided |
| --- | --- |
| February 26, 2019 | June 10, 2019 |

Walter F. Kawalec, III, argued the cause for appellants
(Marshall Dennehey Warner Coleman & Goggin,
attorneys; Walter F. Kawalec, III, on the briefs).

Michael B. Zerres argued the cause for respondents
(Blume Forte Fried Zerres & Molinari, attorneys;
Michael B. Zerres, of counsel, and Robin A. Donato, on
the brief).

William L. Gold argued the cause for amicus curiae New
Jersey Association for Justice (Bendit Weinstock,
attorneys; William L. Gold, of counsel and on the brief,
and Kay A. Gonzalez, on the brief).

In this case, we must determine whether plaintiff T.L. is entitled to a new trial because -- without objection from T.L. -- defendant Jack Goldberg, M.D., gave trial testimony inconsistent with his discovery responses.

In this medical malpractice action, T.L. claims Dr. Goldberg committed malpractice by prescribing a medication that she asserts should not be prescribed to individuals, who, like her, have a history of depression. During discovery, Dr. Goldberg claimed that he did not recall relying upon any medical publications when prescribing the medication to T.L. and, more specifically, was "not aware of any studies in the Journal of Clinical Oncology" relating to the medication. The trial court thus granted T.L.'s motion to bar the doctor from referring to medical literature at trial.

Dr. Goldberg's testimony at trial, however, was inconsistent with his discovery responses. Dr. Goldberg claimed he relied upon a 2009 publication from the Journal of Clinical Oncology indicating that individuals with a history of depression could be prescribed the medication. T.L.'s counsel did not object to Dr. Goldberg's change in testimony.

After a jury found that Dr. Goldberg did not deviate from the standard of care and commit malpractice, T.L. filed a motion for a new trial. She argued

that allowing Dr. Goldberg's change in testimony constituted reversible error. The trial court denied T.L.'s motion -- finding that T.L. was given a fair opportunity to present her case and raise any inconsistencies with Dr. Goldberg's testimony.

On appeal, an Appellate Division panel split over whether Dr. Goldberg's change in testimony warranted a new trial. The majority held that T.L. was entitled to a new trial, citing McKenney v. Jersey City Medical Center, 167 N.J. 359 (2001), because defense counsel failed to alert T.L. to Dr. Goldberg's change in testimony. The dissenting judge, however, determined that T.L.'s counsel did not object to Dr. Goldberg's testimony for strategic reasons because counsel viewed Dr. Goldberg's testimony as helpful to T.L.'s case. Accordingly, the dissent concluded Dr. Goldberg's change in testimony did not violate McKenney or require a new trial.

The panel's opinions present the following questions: whether T.L. is entitled to a new trial pursuant to McKenney and whether the admission of Dr. Goldberg's testimony pertaining to the publication, notwithstanding the motion to bar, satisfies the plain error standard -- that is, whether the testimony was "clearly capable of producing an unjust result." R. 2:10-2.

For the reasons set forth below, we agree with the dissent. The circumstances at issue in McKenney, which heavily depended on the prejudice

3

caused to the party disadvantaged by the surprise change in trial testimony, are distinguishable from the change in testimony here. Here there was no demonstration that the changed testimony caused prejudice to T.L. For similar reasons, we do not perceive that the plain error standard compels reversal, especially because counsel's failure to object was likely strategic. In sum, because neither McKenney nor plain error review compels the conclusion that the result below was unjust, we reverse the Appellate Division's judgment.

## I.

## A.

T.L. consulted Dr. Goldberg to receive treatment for essential thrombocythemia, also referred to as "ET", a blood condition that causes the body to overproduce platelets. If left untreated, essential thrombocythemia can cause blood clots and prove fatal. Before she consulted Dr. Goldberg, T.L. had received treatment for essential thrombocythemia and was prescribed, among other things, interferon and Hydrea. T.L. suffered side effects, including nausea, abdominal bloating, and hair loss from Hydrea.

T.L. saw Dr. Goldberg approximately twenty-five times between January 2005 and October 2010. In October 2010, Dr. Goldberg told T.L. about a new medication, Pegasys. A benefit of Pegasys is that a patient can stop taking it

after only forty-eight weeks. T.L. was instructed to take Pegasys on a weekly basis, and Dr. Goldberg prescribed a lower than normal dosage.

After taking Pegasys, T.L. experienced flu-like symptoms, dizziness, numbness and tingling on the right side of her body, and difficulty walking. T.L.'s husband informed Dr. Goldberg that T.L. was experiencing those symptoms, but Dr. Goldberg advised that T.L. should continue taking Pegasys.

On December 26, 2010, T.L. began experiencing severe pain in her neck and both arms. The next day, T.L. felt paralyzed and was transported to the hospital, where she remained for one week. Upon her release from the hospital, T.L. was transferred to a rehabilitation center where she stayed for approximately three weeks. T.L. was diagnosed with acute transverse myelitis, an inflammation of the spinal cord at a specific level of the vertebrae. T.L. also experienced partial paralysis on her right side.

B.

In October 2011, T.L. brought suit against Dr. Goldberg and his employer, Penn Medicine Cherry Hill. T.L. claimed that Dr. Goldberg deviated from accepted standards of care and thus committed malpractice. During discovery, Dr. Goldberg provided certified answers to interrogatories. One interrogatory inquired whether Dr. Goldberg "rel[ied] upon any medical

5

texts or publications in connection with the diagnosis or treatment of [T.L.]" –

and Dr. Goldberg answered, "Not to my recollection."

During his deposition, Dr. Goldberg indicated that he was aware of an international study comparing one medication to pegylated interferon, the generic name for Pegasys. When asked whether he was aware of any other clinical trials "involving the use of pegylated interferon to treat patients with essential thrombocythemia," Dr. Goldberg answered "no." And when asked whether he was "aware of any studies in the Journal of Clinical Oncology pertaining to the use of pegylated interferon to treat patients with [essential thrombocythemia]," Dr. Goldberg answered "no."

Before trial, T.L. moved to bar Dr. Goldberg from utilizing medical literature at the time of trial. Dr. Goldberg agreed that he would not use any literature other than the literature relied upon by T.L., so the trial court barred Dr. Goldberg "from using any additional medical literature that was not produced during the course of discovery."

## C.

At trial, T.L.'s theory of malpractice was that Dr. Goldberg should not have prescribed Pegasys to her because she was diagnosed with, and took medication for, chronic depression. T.L. argued to the jury in her opening

6

statement that the clinical trials for Pegasys excluded individuals with a history of depression.

T.L.'s hematology expert, Dr. Louis Aledort, testified that "depression alone is a reason not to put somebody on Pegasys." Dr. Aledort further testified that the prescribing information stated that Pegasys "should be used with caution in a patient with a history of depression . . . [a]nd that the patient should be monitored to see if the depression gets worse." However, on cross-examination, Dr. Aledort conceded that the prescribing information available in 2010 did not bar a physician from prescribing Pegasys to a patient with a history of depression. Dr. Aledort also conceded that a study's exclusion criteria, such as a history of depression, do not necessarily indicate that the medication is unsafe for individuals who suffer from the exclusion criteria.

Dr. Goldberg's hematology expert, Dr. Azra Raza, testified that Dr. Goldberg did not breach the standard of care by prescribing Pegasys for T.L. According to Dr. Raza, T.L.'s history of depression was not a reason to preclude T.L. from taking Pegasys. In addition, Dr. Raza testified that because T.L. was experiencing side effects from her use of Hydrea, it was reasonable for Dr. Goldberg to try an alternative treatment. Both experts, as well as the parties' neurological experts, provided conflicting testimony as to whether Pegasys caused T.L.'s injury.

7

Dr. Goldberg testified in his defense. He claimed that he prescribed Pegasys to T.L. because he relied upon a clinical trial, published in the Journal of Clinical Oncology in 2009, that included patients with a history of depression:

> Defense counsel: When you prescribed Pegasys for [T.L.] in October of 2010, were you some kind of maverick using [Pegasys]? Was this a . . . new, experimental thing by you?
>
> Dr. Goldberg: I don't think so.
>
> Defense counsel: Why is that?
>
> . . . .
>
> Dr. Goldberg: In 2005, the investigators at M.D. Anderson took pegylated interferon and tested it in a clinical trial to patients with ET. In 2009, they reported their information from the clinical trial ongoing in an article in the Journal of Clinical Oncology.
>
> Defense counsel: Was that part of what you were using in -- in your prescribing Pegasys? Were you looking at things like that?
>
> Dr. Goldberg: Absolutely.
>
> . . . .
>
> Defense counsel: [D]idn't [T.L.]'s prior experience with the older form of interferon and her prior history of . . . depression . . . disqualify her from Pegasys in 2010?
>
> Dr. Goldberg: No, absolutely not.

8

> Defense counsel: And briefly, why?
>
> Dr. Goldberg: Very briefly, the clinical trial in 2005 that was produced and done by M.D. Anderson included patients with depression. . . . The only patients who were excluded were major depression, not controlled. . . . [T]he patients with ET were bad ETs. . . . They had been on Hydrea. And guess what. They were on interferon. And so they were treated, re-treated, this time with Pegasys . . . . So, that influenced me to [discuss Pegasys with T.L.].

T.L.'s counsel did not object to that exchange. On cross-examination, Dr. Goldberg did concede that, when he prescribed Pegasys for T.L., he was aware that the drug posed a risk for patients with a history of depression.

After approximately twelve days of trial, the jury found that Dr. Goldberg did not deviate from the applicable standard of care. T.L. filed a motion for a new trial, arguing for the first time that Dr. Goldberg's discussion of the 2009 publication constituted reversible error. In response to T.L.'s motion, Dr. Goldberg produced the 2009 publication to which he had referred. In relevant part, the 2009 publication provided that individuals with a history of depression were excluded from the study.

At oral argument on the motion, T.L.'s counsel explained that he did not object to Dr. Goldberg's testimony because he "wasn't sure how [the jury] would perceive it." T.L.'s counsel explained that because he "didn't have the [2009 publication] to cross-examine the witness on, [he] didn't know where to

9

go with it." The trial court denied T.L.'s motion for a new trial because "both sides were given a fair and reasonable opportunity to present its case and to object and highlight . . . inconsistencies [or] inaccuracies with either sides' presentation of the facts" -- and because T.L. failed to present "clear and convincing evidence that there was [a] miscarriage of justice under the law."

D.

An Appellate Division majority reversed the trial court's denial of T.L.'s motion for a new trial and remanded for a new trial. T.L. v. Goldberg, 453 N.J. Super. 539, 542 (App. Div. 2018). The majority found that Dr. Goldberg materially contradicted his sworn deposition testimony when he testified at trial that he relied on the 2009 publication when prescribing Pegasys for T.L. Id. at 556. Accordingly, in the majority's view, defense counsel was obligated, pursuant to McKenney, to disclose the anticipated change in testimony to T.L. Id. at 557. Defense counsel's nondisclosure, the majority held, constituted plain error and warranted a new trial. Id. at 558-59. Although the majority stated that T.L.'s failure to object to Dr. Goldberg's testimony was "inexplicable," it found that the failure was not fatal to T.L.'s argument for a new trial. Ibid.

In dissent, Judge Currier opined that T.L.'s counsel declined to object to Dr. Goldberg's testimony for "strategic" and "tactical" reasons. Id. at 562

10

(Currier, J., dissenting). According to Judge Currier, the record showed that T.L.'s "counsel was well aware of the clinical study discussed by [Dr. Goldberg] and found it helpful to [T.L.'s] case." Id. at 563. Thus, Judge Currier determined, T.L. was not prejudiced by Dr. Goldberg's testimony pertaining to the 2009 publication. Id. at 564.

In Judge Currier's view, the majority's reliance on McKenney was "misplaced." Ibid. Judge Currier did agree "that defense counsel should have advised [T.L.] prior to trial of his intended use of the 2009 [publication]" but "[could] not conclude that the failure to do so, without objection, require[d] a new trial." Ibid. In sum, Judge Currier could not "agree with the majority that [Dr. Goldberg's] brief references to a clinical study during his more than four hours of testimony was a clear miscarriage of justice such as to require a reversal of the jury's verdict and a new trial." Id. at 565.

Dr. Goldberg appealed "as of right," based on Judge Currier's dissent, and our review is thus limited to the issues raised in that dissent. See R. 2:2-1(a)(2); accord State v. Micelli, 215 N.J. 284, 292 (2013). We granted amicus curiae status to the New Jersey Association for Justice (NJAJ).

11

II.

A.

Echoing Judge Currier, Dr. Goldberg argues that T.L.'s decision not to object to Dr. Goldberg's testimony was strategic, which contradicts T.L.'s allegation of prejudice. Further, Dr. Goldberg argues that, because T.L. purposefully chose not to object, T.L. should be precluded from arguing that the admission of Dr. Goldberg's testimony satisfies the plain error standard. The majority erred in finding that T.L. overcame the plain error standard, according to Dr. Goldberg, because "the claimed error could not have led the jury to an unjust result." Last, Dr. Goldberg contends that "McKenney simply does not apply."

B.

T.L. argues that we should affirm the Appellate Division's judgment because, in her view, "there is clear and convincing evidence" that allowing Dr. Goldberg's testimony pertaining to the 2009 publication "was a miscarriage of justice under the law." T.L. claims that Dr. Goldberg's testimony pertaining to the 2009 publication was a material change from his discovery responses, was "false and misleading," and was clearly capable of producing an unjust result. The failure to object to Dr. Goldberg's testimony, T.L. maintains, does not preclude a finding of plain error. According to T.L.,

she is entitled to a new trial pursuant to <u>McKenney</u> because defense counsel failed to fulfill his duty to inform her of the material change in Dr. Goldberg's trial testimony.  Last, T.L. disputes the claim that the failure to object was strategic and argues that, rather than focusing on the lack of an objection, this Court should address the prejudice that resulted from Dr. Goldberg's testimony.

C.

The NJAJ primarily addresses what it believes is the appropriate remedy for a <u>McKenney</u> violation.  In the NJAJ's view, every <u>McKenney</u> violation should result in a mistrial or, if the aggrieved party prefers another remedy, any lesser remedy suggested by the aggrieved party.  Further, the NJAJ contends, when there is a <u>McKenney</u> violation, the aggrieved party should be entitled to fees and costs.  A substantial remedy is appropriate, according to the NJAJ, to protect the aggrieved party and to deter parties from violating <u>McKenney</u>.

III.

As stated, the questions presented in this appeal are whether T.L. is entitled to a new trial pursuant to <u>McKenney</u> and whether Dr. Goldberg's unobjected-to testimony pertaining to the 2009 publication, in contravention of the court-ordered ban on the use of "medical literature that was not produced

13

during discovery," constituted plain error, that is, whether the testimony was "clearly capable of producing an unjust result." R. 2:10-2. We review those questions de novo. See Johnson v. Roselle EZ Quick LLC, 226 N.J. 370, 386 (2016) ("We review questions of law de novo, and do not defer to the conclusions of the trial or appellate courts."). We address each in turn.

IV.

A.

In McKenney, the plaintiffs alleged that the defendants, two medical centers and several medical personnel, failed to provide proper medical care before and during Jannie McKenney's delivery of her son. 167 N.J. at 364-65. The plaintiffs contended that the defendants should have discovered, through various sonograms, that the fetus had a defect. Ibid. Plaintiff Jannie McKenney claimed she would have aborted her pregnancy had she been timely informed of the defect. Id. at 364. In addition, the plaintiffs claimed that the defendants exacerbated the defect by performing a vaginal delivery, rather than a caesarian section. Ibid.

The critical issue in the case was whether Dr. Hu, the chief Obstetric/Gynecological resident at one of the medical centers, reviewed the sonograms on or after August 13, 1990, since Jannie McKenney could no longer obtain a legal abortion after August 13. Id. at 366-67, 375-76. Dr. Hu

14

offered conflicting accounts as to when he reviewed the sonograms. Ibid. During his deposition, Dr. Hu claimed that he likely reviewed the sonograms on August 13 because they were taken at the medical center where he was then working. Id. at 366. At trial, however, Dr. Hu claimed that he did not review the sonograms until after August 13 because they were taken at the other medical center. Ibid. This Court observed that Dr. Hu's "change in testimony was critical." Ibid.

The plaintiffs were also surprised at trial by another change in testimony. Id. at 367, 373-75. Sipra De, a sonogram technician, was named as a defendant because the plaintiffs alleged "that she failed to ensure that the sonogram images . . . were read and interpreted by a doctor." Id. at 365. The trial court granted De summary judgment several months before the trial commenced. See ibid. At her deposition, De testified that she did not make a notation on one of the sonograms. Id. at 367.

"At trial, however, De admitted that she had made the notation." Ibid. "That admission," as well as another admission that differed from De's deposition testimony, "suggested that, in contrast to her deposition testimony, her skills exceeded those of a 'mere' technician." Id. at 367-68. It was undisputed that defense counsel could have brought De's change in testimony

15

to the plaintiffs' attention because defense counsel conceded that he was aware of the anticipated change. Id. at 369.

"At the close of De's direct examination, plaintiffs' attorney informed the trial court that De had contradicted her deposition testimony," moved for a mistrial, and sought to bring De back into the case. Id. at 368. The trial court denied those applications. Ibid. After the jury returned verdicts in the defendants' favor, the plaintiffs moved for a new trial, but the trial court denied that application. Id. at 368-69.

On appeal, the plaintiffs contended that the change in Dr. Hu's and De's trial testimony warranted a new trial, but the Appellate Division disagreed and affirmed. Id. at 369. This Court granted certification to determine "whether defense counsel were obligated to communicate material changes in defendants' testimony to plaintiffs prior to trial and whether plaintiffs were entitled to a mistrial as a matter of law due to defendants' failure to make such disclosures." Ibid.

This Court held that "defense counsel had a continuing obligation to disclose to the trial court and counsel for plaintiffs any anticipated material changes in a defendant's or a material witness's deposition testimony." Id. at 371. This Court found the "impact of the unanticipated testimony" prejudicial because "some of De's surprise testimony was extremely beneficial to Dr.

16

Hu"; because De's trial testimony indicated that she had a greater role in the case -- in fact, "inculpated her[]" -- than what her deposition testimony indicated; and because Dr. Hu's change in testimony was critical to the jury's verdict on causation.  Id. at 372-75.  Accordingly, this Court held that the trial court's "failure to grant a mistrial was an abuse of discretion."  Id. at 376.

B.

In an appeal from the denial of a motion for a new trial, we must decide "whether there was a miscarriage of justice under the law."  Hayes v. Delamotte, 231 N.J. 373, 386 (2018) (quoting Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 522 (2011)).  When a party specifically argues that a change in testimony warrants a new trial, our assessment of the motion is informed by the principles discussed in McKenney.

In McKenney, the change in testimony was egregious and clearly prejudicial to the plaintiffs.  It implicated the potential liability of a witness who had been granted summary judgment.  De was no longer a defendant when she offered testimony that inculpated herself and relieved Dr. Hu of liability, at least in part.

Here, on the other hand,  Dr. Goldberg's change in testimony was arguably favorable to T.L.'s case because it showed Dr. Goldberg was aware that the 2009 studies indicated Pegasys posed a risk to patients, such as T.L.,

17

with a history of depression -- and thus T.L.'s counsel's decision not to object was likely strategic. Counsel most likely did not object because he thought that it was even more inculpatory that Dr. Goldberg knew the studies excluded patients with depression and yet he still prescribed Pegasys to T.L. Therefore, as the dissent points out, it appeared to be a conscious choice to cross-examine Dr. Goldberg rather than to object to the testimony. Plaintiffs have not shown prejudice, and that important and clear difference distinguishes this case from the relief granted in McKenney.

In addition, we note that, counsel in McKenney objected to De's change in trial testimony during the trial, contrary to the lack of objection here. In McKenney, counsel gave the trial court an opportunity to address De's change in trial testimony during the trial -- but no such opportunity was given to the trial court here. And, in McKenney, the attorney for the medical centers conceded that he knew De's trial testimony would differ from her deposition. Here, however, defense counsel's knowledge of Dr. Goldberg's change in testimony is disputed. In all, this case is unlike McKenney and does not require the relief we deemed necessary in that matter.

## C.

Nor is plaintiff entitled to relief by operation of the plain error standard of review. Here, plaintiffs' counsel failed to object to Dr. Goldberg's breach

18

of the court order barring his use of "medical literature that was not produced during discovery." To warrant reversal and entitlement to a new trial, the plain error must have been clearly capable of producing an unjust result. We cannot conclude that standard has been met here. As already explained, strategic reasons can be inferred from counsel allowing Dr. Goldberg to testify on the path he proceeded down, and the failure to object itself suggests that it was not perceived to be as fatal as is now argued. See Risko, 206 N.J. at 523 ("[T]he '[f]ailure to make a timely objection indicate[d] that defense counsel did not believe the remarks were prejudicial at the time they were made.'" (second alteration in original) (quoting Jackowitz v. Lang, 408 N.J. Super. 495, 505 (App. Div. 2009)). Thus, this additional argument fails to support the relief of a new trial that plaintiff seeks.

V.

For the reasons stated, the judgment of the Appellate Division is reversed.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, SOLOMON, and TIMPONE join in JUSTICE FERNANDEZ-VINA'S opinion.

19