**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0539-22

ROSE MARIE PIETROBON,
individually, and by and
through her guardian/guardian
ad litem, JASMINE
PIETROBON,

      Plaintiffs-Respondents,

v.

THE HANOVER MANOR
and K & A REALTY,

      Defendants-Appellants.

_____

      Argued March 6, 2024 – Decided March 21, 2024

      Before Judges Firko and Vanek.

      On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-2694-17.

      John C. Simons argued the cause for appellants (Hoagland, Longo, Moran, Dunst & Doukas, LLP, attorneys; Richard J. Mirra, of counsel and on the briefs; Amelia Rose Lyte, on the briefs).

Andrew Alexander Fraser argued the cause for respondents (Laddey, Clark & Ryan, LLP, attorneys; Timothy Edward Dinan, on the brief).

PER CURIAM

In this slip and fall case, defendants The Hanover Manor and K & A Realty appeal from a jury verdict in favor of plaintiff Rose Marie Pietrobon[1] awarding her $4,709,918.44 based on a molded verdict. On appeal, defendants contend that the trial judge erred: in permitting defendants' witnesses to be questioned in a way that suggested they intentionally destroyed evidence; in giving an adverse inference charge to the jury; in allowing plaintiff's experts to testify about her subjective complaints of fear; in permitting plaintiff to read the hearsay statement of a deceased witness into evidence; in forbidding questioning of plaintiff's mother Marie Pietrobon[2] regarding plaintiff's Social Security Disability (SSD) status; and not delineating between ordinary negligence and mode-of-operation on the verdict sheet. We reject defendants' arguments and affirm.

---

[1] We refer to Rose Marie Pietrobon as "plaintiff" in our opinion even though the second amended complaint names her and her guardian ad litem, Jasmine Pietrobon, as plaintiff.

[2] Individuals who share a last name with plaintiff and other individuals are referred to by their first names for ease of reference. By doing so, we intend no disrespect.

# I.

We summarize the evidence and procedural history pertinent to the issues raised on appeal. The facts, although disputed in several reports, are relatively uncomplicated.

## The Accident

Plaintiff is a sixty-five-year-old woman who has been developmentally disabled since birth. She resides with her parents and her sister Jasmine. On May 3, 2015, plaintiff attended a party hosted by the Ripa family at The Hanover Manor. There was a self-service cocktail hour that lasted from 2:00 p.m. to 3:00 p.m. followed by a sit-down meal served by wait staff. The dance floor was open between courses. Marie testified at her deposition that the cocktail hour included "watermelon . . . grapes, . . . strawberries, a[nd] cantaloupe."[3] The wait staff cleaned up the cocktail hour buffet after the cocktail hour ended and cleared away the plates and food on the tables.

Michael Iuspa,[4] a guest at the party, testified at his deposition that he saw plaintiff get up from her table to join another woman on the dance floor when

---

[3] A video of Marie's deposition was played for the jury at trial in lieu of live testimony due to her age and illness.

[4] Due to his age, a video of Iuspa's testimony was played for the jury in lieu of live testimony.

A-0539-22

she "stepped on [something] and . . . fell pretty hard" on a "grape" or "some melon." Iuspa testified the fruit was squashed and you could see that someone "pressed on it." He saw the fruit when plaintiff "fell down" and testified it came from the self-service buffet and testified he saw other guests pick her up and put her on a chair. Marie ran to plaintiff after she fell, who was "hysterically crying," and touching her left leg. Plaintiff fell after the dinner course ended, between 5:00 p.m. and 5:30 p.m. The dancing stopped and everyone was being attentive to plaintiff. Marie testified she observed a man "cleaning" the dance floor after plaintiff fell.

Jasmine received a phone call about plaintiff's accident and drove to the party to bring her home. At the time, Jasmine did not realize that plaintiff had a fractured hip. Several guests helped plaintiff stand up so she could get into Jasmine's car. Defendants claimed that plaintiff tripped over her own feet rather than on a piece of fruit based largely on the disc jockey Louis Arico's testimony that he "was right there" when plaintiff fell, and saw her fall "after dinner." According to Arico, plaintiff "g[o]t up and c[a]me towards the dance floor and tripped" on "[h]er feet." He "d[id]n't see anything that was on the floor."

Debbie Ricigliano, The Hanover Manor's former manager, prepared an incident report regarding plaintiff's fall, which had been "thumb-tacked to a

4

bulletin board in [her] office for a period of time." Steve O'Sullivan, the maître d', testified at his deposition that he didn't know what happened to the incident report but recalled it included the time, date, and apparently anything anyone interviewed could recollect about the incident, such as how it happened and the timing. O'Sullivan testified the incident report contained phone numbers and names of witnesses. He had "no idea" what happened to the surveillance video that captured plaintiff's fall but had the opportunity to review it "for three, four minutes" and admitted he was unable to ascertain what caused plaintiff to fall.

O'Sullivan stated the video showed plaintiff dancing, and it appeared to him that "she just fell backwards, as if she just tripped." O'Sullivan testified wait staff are not allowed to serve food across the dance floor "because of spillage" and confirmed the floor is "marble, granite." In terms of training, O'Sullivan testified the wait staff undergo "hands on" training and are taught "how to spot for any spills."

John Tsanakos, a manager at the facility, testified at his deposition that he was "part of" the training of new wait staff. Tsanakos testified the policy at The Hanover Manor is "[if] you drop something, you pick it up right away," or within "[f]ive minutes max," and they "never left anything on the floor." During the cocktail hour, Tsanakos testified he "would always walk around the area to make

sure there's no accident-prone situation," and he was in and out of the room where the party was held but did not see plaintiff fall. He thought she was fine because "she literally walked out" and "was not carried out."

Upon learning plaintiff fell, Tsanakos went over to her and testified "[i]t didn't seem like nobody was hurt." He inspected the area where plaintiff fell and everything "was fine, nothing was on the floor," so he left and "went to the office to check the video." Tsanakos explained the video was a constant recording and after a week, "it would just loop over the old video." He did not save the video footage of plaintiff's fall. Tsanakos testified he watched the video and "remember[ed] seeing [plaintiff] dancing and her stumbling and falling . . . back." He stated an incident report was created and "was put on [Ricigliano's] board for a while" and he "remember[ed] seeing it," but the incident report did not contain any information about fruit being on the floor.

However, Tsanakos testified he recalled supplying plaintiff with a "template" of the incident report form during discovery and confirmed the form asks for the "date, location, description of the incident, weather conditions, walking surface condi[tions] as well as when and how the incident occurred." He also remembered receiving a letter on July 9, 2015, from plaintiff's former counsel notifying him to maintain all videos and incident reports and testified

6

the incident report was still on the bulletin board when he received the letter. At the time of trial, Tsanakos testified he didn't know what happened to the incident report.

## Plaintiff's Injuries and Surgery

Four days later after the accident, plaintiff was transported to the hospital for an evaluation. Plaintiff underwent an X-ray and was diagnosed with a "100 percent displaced femoral neck fracture" and required a partial hip replacement as noted by her orthopedic surgeon, Dr. Mark Berman. On May 8, 2015, plaintiff underwent surgery. Following the surgery, she had a significant leg length discrepancy, with her left leg being longer than the right leg.

Following her surgery, plaintiff was hospitalized for over a week. She was transferred to Daughters of Israel for in-patient rehabilitation for a month before coming home. Plaintiff continued with outpatient physical therapy, but it didn't improve her condition.

## Barbara Carpenito's Handwritten Statement

On December 7, 2015, witness Barbara Carpenito, a guest at the party, prepared a handwritten statement, at the behest of plaintiff's counsel, in which Carpenito was asked:

A-0539-22

Question No. 3:

Q[:] "Did you witness the accident in question? If you did witness the a[ccident] in question, please describe the events in detail as they occurred, to the best of your knowledge?

A[:] Carpenito responded "yes" and responded: [Plaintiff] got up and stepped on the dance floor and slipped on something on the floor, and fell immediately."

Question No. 7:

Q[:] "Was there something on the floor that caused [plaintiff] to fall? If yes, please decide what it was, including the size, shape, and consistency.

A[:] Not sure what it was, but there was something, food possibly, squashed on the floor."

Carpenito also drew a diagram depicting what she saw regarding plaintiff's accident. On June 9, 2016, Carpenito gave a recorded statement to defendants' insurance investigator, which was transcribed. Defendants would not provide the statement they obtained from Carpenito to plaintiff on the grounds of privilege. Carpenito was never deposed. Regrettably, Carpenito passed away before trial.

The Litigation and Pre-Trial Proceedings

On April 17, 2017, plaintiff filed a negligence and premises liability complaint against defendants. On February 13, 2018, plaintiff moved to compel

8

defendants to provide Carpenito's June 9, 2016 statement made to their insurance investigator, which the motion judge granted. Defendants moved for reconsideration. Before ruling, the motion judge entered an order providing he would conduct an in camera review of Carpenito's two statements to determine whether her June 9, 2016 statement given to defendants' insurance investigator was inconsistent with her December 7, 2015 handwritten statement that plaintiff had obtained and whether there were grounds to require disclosure on the basis of substantial need and undue hardship under Rule 4:10-2(c).[5] The motion judge determined that plaintiff was not entitled to Carpenito's June 9, 2016 statement

---

[5]  Rule 4:10-2(c) provides in pertinent part:

> [A] party may obtain discovery of documents, electronically stored information, and tangible things otherwise discoverable under R[ule] 4:10-2(a) and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including an attorney, consultant, surety, indemnitor, insurer or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

because the content was nearly the same as her December 7, 2015 statement, which plaintiff already had, and there were "no material inconsistences" in the two statements.

In 2018, plaintiff was evaluated by Dr. Mary Ann Kezmarsky, a psychologist, because of anxiety she developed after the fall. Dr. Kezmarsky testified plaintiff's IQ is in the extremely low range, and she noted plaintiff is "much like a child" when you talk to her. According to Dr. Kezmarsky, plaintiff "is so afraid" and "wants to be with mommy, or her sister," or someone that is going to take care of her to make sure she doesn't get hurt.

Dr. Kezmarsky stated plaintiff sleeps with her mother due to the fear, needs hands-on supervision in the shower, and uses a cane. Dr. Kezmarsky tried to administer biofeedback, but plaintiff "was very fearful of the apparatus." Dr. Kezmarsky concluded that plaintiff's "significant fear" was secondary to the slip and fall accident, and "the issues at this point . . . [are] permanent."

On May 1, 2019, the motion judge ordered that plaintiff submit to an independent neuropsychiatric evaluation to determine her competency to testify at trial. Dr. Kenneth C. Kutner conducted the evaluation and concluded plaintiff was incompetent to testify at trial.

On December 20, 2019, plaintiff moved for leave to file and serve an amended complaint to add a count for fraudulent concealment and spoliation of evidence regarding the incident report prepared by Ricigliano. The motion was granted.

On April 13, 2021, defendants moved in limine to bar certain statements made to plaintiff's experts, Dr. Berman, Dr. Bradley Cash, a physical medicine rehabilitation expert, and Dr. Daniel Wolstein, a vocational and rehabilitation expert, as hearsay, and to bar Dr. Kezmarsky's expert report as an inadmissible net opinion. Following oral argument, the motion judge denied both motions, however, he barred the experts from testifying as to statements made by plaintiff or Jasmine regarding the specific cause of the accident. Defendants moved for leave to appeal those orders, which we denied. Plaintiff moved for leave to file and serve a second amended complaint to substitute Jasmine in place of Marie as her guardian ad litem, which was granted.

The Trial and Related Motions

The matter was tried before a jury on nine non-consecutive days in September 2022. Before the trial began, the trial judge dismissed plaintiff's claim for fraudulent concealment. Defendants moved in limine to preclude plaintiff from playing a "Day-in-the Life" video of plaintiff during trial. The

11

trial judge denied the motion. During trial, plaintiff moved to exclude a portion of Marie's testimony regarding plaintiff's SSD status, which was granted.

Plaintiff also moved in limine during trial to admit Carpenito's December 7, 2015 handwritten statement into evidence pursuant to N.J.R.E. 804(b)(6), which defendants opposed. However, the motion was granted. The trial judge permitted plaintiff to read the December 7, 2015 statement to the jury finding, "it is so highly relevant and I agree that this does not present any new theory" and "on balance, the probative value exceeds the prejudice."

On the issue of liability, plaintiffs presented testimony from Dennis Gemberling, an expert in hospitality and food service industry management. Gemberling testified that he "assume[d]" The Hanover Manor had practices and policies in place to prevent what happened to plaintiff, but it "just didn't follow them." He explained the ballroom was set up in a way that "created a situation where guests were going to have to carry plates of food essentially from one end of the room across the dance floor to the other side of the room." Gemberling testified "that just creates the potential for food that's going to fall off plates very easily, particularly when there's dancing going on."

Based upon his review of the records, Gemberling opined the wait staff "weren't really watching the floor," and there was no indication that defendants

were monitoring the dance floor or cleaned up spills within five minutes, as is customary in the food service industry. Gemberling stated "you want to separate the entertainment from the food service" and have tables in close proximity to the buffet to avoid a situation where individuals are coming over to the dance floor.

Gemberling testified the fruit plaintiff slipped on "had been there for potentially quite some time" based on Iuspa's testimony that he saw the fruit on the dance floor right after plaintiff fell, which was several courses after the buffet had been served. Gemberling concluded defendants' departure from industry standards and practices resulted in a dangerous condition, fruit on the dance floor, causing plaintiff to slip and fall and sustain injuries.

Jasmine testified that despite her disability, plaintiff "was very happy go lucky" and "[v]ery friendly, very social" before her accident and enjoyed going out with her friends, helping with chores around the house, and walking a dog. While plaintiff never obtained a paying job, Jasmine testified she volunteered at a local hospital before it closed. Jasmine stated plaintiff "never had any physical limitations" before the accident and could take care of herself, walk normally, ride a bike, sleep by herself, and be left alone for periods of time.

A-0539-22

Dr. Berman testified about plaintiff's surgery and subsequent impairments, which include her leg length discrepancy throwing "off her pelvis," and that she suffers from back pain and "chronic pain" when she walks. Dr. Berman testified that plaintiff now has a "significant limp" and the feeling of an "unsteady gait." In Dr. Berman's opinion, plaintiff's injuries were "directly related to the injury she sustained" at The Hanover Manor and are "permanent" in nature.

Dr. Kezmarsky testified there "had been no real change in [plaintiff's] fear and anxiety" since the accident, and she was "homebound." In terms of plaintiff's fear of falling, Dr. Kezmarsky testified "[w]ith the level of intellectual functioning that she is at, she doesn't have the capacity to problem solve that out. It is just, that fear is stuck, she can't go get rid of it."

Accordingly, Dr. Kezmarsky opined the "significant fear" that plaintiff was experiencing "was secondary to the slip and fall and the traumatic events surrounding the incident," and at this point, the issues "could be considered permanent" and caused plaintiff to "los[e] that little bit of independence that she had that used to make her feel pretty good."

Dr. Cash testified he evaluated plaintiff after her surgery. Dr. Cash opined plaintiff's walking and gait pattern is worsening over time and will never return

14

to normal.  Dr. Cash opined that plaintiff "will now require [twenty-four]-hour care seven days supervision" due to her "reduced functional status, her lack of ability to function independently, to walk . . . eat or dress independently."

Wolstein agreed with Dr. Cash that plaintiff will need "24/7, 365 days per year" care in the future, and the lowest amount of money the jury could award to cover the future costs of care would be in the range of $1,264,000 to $2,474,000, which would involve plaintiff residing in a skilled nursing facility. At the highest end, Wolstein testified the range could be between $4,369,000 and $5,308,000, which would account for in-home care.

At trial, O'Sullivan testified that he watched the video after he was informed plaintiff had fallen.  On direct examination, defense counsel asked O'Sullivan: "And are you at all involved in what . . . happen[ed] to the video?" O'Sullivan responded, "[n]o."  On cross-examination, the trial judge allowed plaintiff to inquire about the whereabouts of the video but not to insinuate that O'Sullivan destroyed the video purposely or taped over it.

Tsanakos testified on direct examination that Ricigliano created the incident report, "[i]t was put on her board for a while," he recalled seeing it, and was able to view the contents of the report.  On cross-examination, plaintiff

questioned Tsanakos about how the incident report was created and what it contained. Specifically, plaintiff asked Tsanakos:

> Q: You told the jury a woman, named . . . [Ricigliano], worked for you in 2015 and she created an incident report after the event?
>
> A: Yes.
>
> Q: And you told us at your deposition that the incident report that you create includes the name, phone numbers, and the description of the incident, correct?
>
> A: True.

Defendants did not object to this line of questioning.

Plaintiff also cross-examined Tsanakos regarding the spoliation letter:

> Q: You told us at your deposition that you received a letter regarding [plaintiff] correct?
>
> A: Yes.
>
>   . . . .
>
> Q: And what's the date that it was sent to you?
>
> A: Looks like July 9, 2015.
>
> Q: July 9, 2015, correct?
>
> A: Right . . . .
>
> Q: So two months and few days after [plaintiff] slipped and fell?

A-0539-22

A: Yes.

Q: And this is from an attorney, is it not?

A: Uh, it's from an attorney, yes.

Q: And it says that the attorney represents [plaintiff] in connection with a serious and permanent injury she sustained when she was caused to fall on May 3rd, 2015 on the dance floor at [The] Hanover Manor, correct?

A: True.

Q: And it says, puts you on notice: "In anticipation of a claim with regard to the aforementioned . . . please retain and provide all videos, surveillance, security tapes, photographs, and any and all incident reports in your possession relating to that accident," correct?

A: True.

Q: It goes on to say in the next sentence, "If these things are destroyed, there'll be a claim for spoliation made against you," correct?

[Defense counsel]: Objection, Judge.

[Plaintiff's counsel]: I'll withdraw it.

THE COURT: Thank you.

[Plaintiff's counsel]: In the next paragraph, it says, "To reiterate, the failure to retain and provide this office with the video surveillance, security tapes, photographs, and any and all incident reports would be in our view a destruction of evidence for the civil claim," correct?

17

A: That's what it says.

Besides the objection to the question that was withdrawn, defendants did not otherwise object to plaintiff's cross-examination of Tsanakos about the incident report.

Plaintiff also questioned Tsanakos about the video on cross-examination:

> Q: You told the jury that you allowed the surveillance tape to be taped over about a week [after the accident]?
>
> A: I didn't allow it.
>
> Q: Was the surveillance video taped over about a week later?
>
> A: Yes it was, not purposely.

Regarding the purpose of the video surveillance system, plaintiff asked Tsanakos:

> Q: We asked you what the purpose of having surveillance in the ballroom was. Do you recall your answer?
>
> A: I first bought it because of theft. We had some theft going on in the place, and that's the main reason why I bought it.
>
> Q: You also told us for liability reasons, correct, if . . . somebody slips and falls?
>
> A: Of course.

Defendants presented competing medical testimony from Dr. Howard Blank, an expert in orthopedics. Dr. Blank reviewed plaintiff's medical records and examined her in October 2018. Blank testified plaintiff's limp "was very mild," but she appeared to "shuffle her feet," and used a cane. Dr. Blank did not think plaintiff's leg discrepancy was significant and would not cause her pain. He opined her "prognosis was reasonably good," and "she would [not] have any further problems." While Dr. Blank did not expect plaintiff to improve, he also did not "expect her to get worse."

The jury returned a verdict in favor of plaintiff finding no comparative negligence, awarded $3,800,000 for future medical expenses, and $750,000 for past and future pain and suffering, disability, impairment, and loss of enjoyment of life. No post-judgment motions were made.

II.

In considering defendants' arguments, we apply well-established standards of appellate review. In general, we apply a narrow scope of review to civil jury verdicts. We ordinarily do not set them aside and order a new trial unless there has been a proven manifest injustice. See R. 4:49-1; see also Kozma v. Starbucks Coffee Co., 412 N.J. Super. 319, 324 (App. Div. 2010); Boryszewski v. Burke, 380 N.J. Super. 361, 391 (App. Div. 2005).

Most of defendants' contentions on appeal assert the trial judge erred in making evidential rulings. Such rulings to admit or exclude evidence are generally subject to a wide degree of discretion. Ordinarily we will not set aside civil verdicts on this basis unless the court has abused its discretion, including with respect to issues of the admissibility of expert opinion. Hisenaj v. Kuehner, 194 N.J. 6, 16 (2008); see also Dinter v. Sears, Roebuck & Co., 252 N.J. Super. 84, 92 (App. Div. 1991) (citations omitted). We cannot find that any of the trial judge's rulings produced a miscarriage of justice in this case.

A.

On appeal, defendants argue that the trial judge erred in permitting defense witnesses O'Sullivan and Tsanakos to be questioned in a manner that implied they deliberately taped over the surveillance video and destroyed the incident report in order to hide evidence. Defendants assert plaintiff's trial strategy was to "cast a shadow of suspicion" over defendants resulting in a prejudicial effect of this strategy being substantially outweighed by any probative value as to counsel's questions.

Plaintiff counters she did not imply evidence was deliberately destroyed, but questioned defendants' witnesses about the video and incident report "to show relevant evidence was not preserved." Plaintiff also contends these

witnesses testified about the video and incident report on direct examination and therefore, cross-examination was warranted and not prejudicial.

"When a trial court admits or excludes evidence, its determination is 'entitled to deference absent a showing of an abuse of discretion, i.e., [that] there has been a clear error of judgment.'" Rowe v. Bell & Gossett Co., 239 N.J. 531, 551 (2019) (alteration in original) (quoting Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016)). Accordingly, "we will reverse an evidentiary ruling only if it 'was so wide [of] the mark that a manifest denial of justice resulted.'" Ibid. (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 497 (1999)).

However, when a party does not object to an alleged error at trial, Rule 2:10-2 requires the appellate court to "determine whether any error . . . was 'of such a nature as to have been clearly capable of producing an unjust result.'" Toto v. Ensuar, 196 N.J. 134, 144 (2008) (quoting Mogull v. CB Com. Real Est. Grp., Inc., 162 N.J. 449, 464 (2000)); see also T.L. v. Goldberg, 238 N.J. 218, 232 (2019) ("To warrant reversal and entitlement to a new trial, the plain error must have been clearly capable of producing an unjust result."). "If not, the error is deemed harmless and disregarded." Toto, 196 N.J. at 144. "Relief under the plain error rule, R. 2:10-2, at least in civil cases, is discretionary and 'should

be sparingly employed.'" Baker v. Nat'l State Bank, 161 N.J. 220, 226 (1999) (quoting Ford v. Reichert, 23 N.J. 429, 435 (1957)).

At trial, defendants made a general objection to plaintiff's questioning of O'Sullivan and Tsanakos about the incident report, arguing it is "not something that's germane to the case" and "is too prejudicial". The trial judge ultimately allowed the questioning, ruling that "it sounds to me that [plaintiff's counsel] is simply indicating it exists" but cautioned, "[j]ust don't make any inferences or say that where did it go, did you destroy it[?]" However, defendants did not object at trial to several specific questions they now challenge on appeal. Therefore, we review those lines of questioning under the plain error standard. R. 2:10-2.

On appeal, defendants specifically object to plaintiff's questioning of O'Sullivan as to "where the incident report went" and "what were [d]efendant's policies for retaining the reports . . . " Following the trial judge's ruling allowing questioning as to the incident report, plaintiff's counsel asked O'Sullivan:

> Q: Do you know what happened to [plaintiff's] incident report?
>
> A: No, I do not.
>
> Q: You told us at your deposition at the time that the defendant had no policy or procedure about keeping or retaining incident reports, correct?

22

A: Okay. Yes.

Defendants made no objection.

We have noted "a question in cross-examination is improper where 'no facts concerning the event on which the question was based were in evidence and the [questioner] made no proffer indicating his ability to prove the occurrence.'" Manata v. Pereira, 436 N.J. Super. 330, 348 (App. Div. 2014) (quoting State v. Rose, 112 N.J. 454, 500 (1988)).  Moreover, "[o]rdinarily the scope of cross-examination of a witness rests in the discretion of the trial judge . . . and an appellate court will not interfere with the control thereof by him unless clear error and prejudice is shown." Janus v. Hackensack Hosp., 131 N.J. Super. 535, 540 (App. Div. 1974).

We conclude it was not error for plaintiff to ask O'Sullivan about his knowledge of the incident report or the policies for retaining them.  The incident report was relevant to the litigation, and the record shows plaintiff did not insinuate that O'Sullivan deliberately destroyed the report.  A single question as to "what happened to [plaintiff's] report" and another confirming there was no policy to keep the report was not error, let alone enough to have been "clearly capable of producing an unjust result." Goldberg, 238 N.J. at 232.

Moreover, Tsanakos testified on direct as to the existence, creation, and contents of the incident report. Plaintiff did not cross-examine Tsanakos to find out whether he destroyed the incident report; instead, plaintiff questioned him to establish the report existed and was now missing. We discern no error and conclude plaintiff's cross-examination of Tsanakos was proper. Manata, 436 N.J. Super. at 348. At trial, plaintiff read the exact wording of the spoliation letter and used cross-examination to show that the report should have been preserved and was not. Again, we conclude this line of questioning was proper and not clearly capable of producing an unjust result, given the case as a whole. Goldberg, 238 N.J. at 232.

Defendants also argue it was improper for plaintiff to question O'Sullivan about "what happened to the video." However, plaintiff asked only one question of O'Sullivan on cross-examination on this issue: "[W]hat happened to [the video] after you looked at it?" O'Sullivan responded he "ha[d] no idea." Defendants did not object to that question at trial. Clearly, plaintiff was allowed to inquire on cross-examination the whereabouts of the video once defendants opened the door on direct examination. See N.J.R.E. 611(b) ("Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility.").

24

Plaintiff also did not improperly suggest that the surveillance system was purchased for liability reasons when cross-examining Tsanakos. At trial, Tsanakos confirmed that was true, consistent with what he previously testified to at his deposition. This was proper under the circumstances. See Parker v. Poole, 440 N.J. Super. 7, 22 (2015) ("Deposition testimony of a witness may be used 'for the purpose of contradicting or impeaching' a witness at trial." (quoting R. 4:16-1(a))). And, defendants never objected to this line of questioning, and there is nothing to indicate it produced an unjust result. Toto, 196 N.J. at 144.

Furthermore, plaintiff did not suggest O'Sullivan destroyed the video or that he purposely taped over it. We are satisfied plaintiff's line of questioning was not clearly capable of producing an unjust result. See Toto, 196 N.J. at 144 (noting, when a party fails to object, the reviewing court must determine whether any error was clearly capable of producing an unjust result). Thus, we reject defendants' argument.

B.

Defendants contend the trial judge erred by giving the jury an adverse inference charge as to the incident report despite a prior order that dismissed plaintiff's fraudulent concealment count and determined plaintiff was not entitled to an adverse inference charge at trial. At the charge conference,

defendants asserted there was a ruling that there was no spoliation found regarding the incident report. Plaintiff countered the trial judge didn't rule on spoliation but made a ruling on fraud on the basis defendants were on notice to preserve evidence, in particular, the incident report, not the video, and failed to do so.

The trial judge revised his earlier decision not to give the adverse inference charge stating, "there may have been no basis on the record [then], but I've now heard all of the evidence in this case and there's clearly evidence of the existence of an incident report that was in the possession of . . . defendants and no longer is, with no explanation as to where it went." The trial judge explained there was no fraudulent concealment in this case, but "[t]hat doesn't obviate the need for an adverse inference charge."

Here, the trial judge modified the adverse Model Civil Jury Charge to apply to the incident report as opposed to a missing witness and charged the jury as follows:

> Reference has been made to—in this case to an incident report which is relevant to the matter before you and that the defendant has failed to produce it. The rule is that, where a party, whether it be the plaintiff or the defendant, fails to produce a document which that party would naturally be expected to produce, you have a right to infer that the document, if the document had

been produced, it would have been adverse to the interest of the party, plaintiff or defendant.

The reason for this rule is that, where you would normally expect a party to produce a document and that party without reasonable explanation fails to do so, that leaves a natural inference that the non-producing party fears exposure of the facts which would be unfavorable to him, her, or it.

Appropriate and proper jury instructions are essential for a fair trial. Prioleau v. Ky. Fried Chicken, Inc., 223 N.J. 245, 256 (2015). "A jury is entitled to an explanation of the applicable legal principles and how they are to be applied in light of the parties' contentions and the evidence produced in the case." Viscik v. Fowler Equip. Co., 173 N.J. 1, 18 (2002) (quoting Rendine v. Pantzer, 276 N.J. Super. 398, 431 (App. Div. 1994), aff'd, 141 N.J. 292 (1995)). To that end, "[j]ury charges 'must outline the function of the jury, set forth the issues, correctly state the applicable law in understandable language, and plainly spell out how the jury should apply the legal principles to the facts as it may find them.'" Prioleau, 223 N.J. at 256 (quoting Velazquez v. Portadin, 163 N.J. 677, 688 (2000)).

"Nonetheless, not every improper jury charge warrants reversal and a new trial. 'As a general matter, [appellate courts] will not reverse if an erroneous jury instruction was 'incapable of producing an unjust result or prejudicing

substantial rights.'" Prioleau, 223 N.J. at 257 (alteration in original) (quoting Mandal v. Port Auth. of N.Y. & N.J., 430 N.J. Super. 287, 296 (App. Div. 2013)).

A spoliation charge may be appropriate whether the adverse party has destroyed the evidence intentionally or negligently, if the party had a duty to preserve the evidence. See Bldg. Materials Corp. of Am. v. Allstate Ins. Co., 424 N.J. Super. 448, 472 (App. Div. 2012); Manorcare Health Servs. v. Osmose Wood Preserving, Inc., 336 N.J. Super. 218, 226 (App. Div. 2001).

To establish spoliation, the party asserting evidence was spoliated must show:

> (1) pending or probable litigation [between the two parties]; (2) knowledge by the [alleged spoliating party] of the existence or likelihood of litigation; (3) foreseeability of harm to the [other party], or in other words, discarding the evidence would be prejudicial to [the other party]; and (4) evidence relevant to the litigation.
>
> [Id. at 226 (quoting Aetna Life and Cas. Co. v. Imet Mason Contractors, 309 N.J. Super. 358, 366 (App. Div. 1998)).]

At trial, plaintiff established all four elements of spoliation as to the incident report: there was pending and probable litigation involving The Hanover Manor as soon as plaintiff slipped and fell; both parties knew of the

existence of likelihood of litigation following the fall; discarding the incident report was prejudicial to plaintiff, as the report contained a description of what happened, and phone numbers and addresses for any witnesses; and the incident report was clearly relevant to the litigation as to whether defendants were negligent in causing plaintiff's fall, See N.J.R.E. 401. Manorcare, 336 N.J. Super. at 226.

Plaintiff established the incident report was created by defendants, was kept in the office "for awhile" but was misplaced and unavailable at trial. Moreover, Tsanakos testified he received the spoliation letter from plaintiff's former counsel advising him to maintain all incident reports and that the report was still in Ricigliano's office when he received the letter, but he didn't know what happened to it. We find no error in the trial judge's decision to give an adverse inference charge. Manorcare, 336 N.J. Super. at 330-31; Rosenblit v. Zimmerman, 166 N.J. 391, 401 (2001); see also Davis v. Barkaszi, 424 N.J. Super. 129 (App. Div. 2012) (quoting Cockerline v. Menendez, 411 N.J. Super. 596, 621 (App. Div. 2010)) (The jury should be given an adverse inference instruction "if plaintiff makes a 'threshold showing' that defendant improperly caused the loss of evidence.").

Defendants' reliance on Tartaglia v. UBS PaineWebber, Inc., 197 N.J. 81 (2008), is misplaced. In Tartaglia, our Court identified five factors that must be shown to establish fraudulent concealment, not spoliation of evidence, as defendants assert in their merits brief. Id. at 118. One of the elements for fraudulent concealment detailed in Tartaglia is "[t]hat defendant intentionally withheld, altered or destroyed the evidence with purpose to disrupt the litigation." Ibid. But, in contrast, intent is not a factor in determining spoliation of evidence. Manorcare, 336 N.J. Super. at 226; Aetna, 309 N.J. Super. at 368. Thus, we reject defendants' argument that plaintiff was not entitled to an adverse inference charge because her fraudulent concealment count had been dismissed. The fact there was no evidence of fraud or intent on defendants' part is irrelevant to the analysis.

Defendants maintain the incident report did not contain any facts of consequence. But O'Sullivan testified the report included anything anyone could recollect about plaintiff's incident, including how it happened, along with names and phone numbers of witnesses. Moreover, Tsanakos confirmed that The Hanover Manor's template incident report asks for the "date, location, description of the incident, weather conditions, walking surface condi[tions]" as well as "when [the incident] occurred" and "how it was reported and when."

No reasonable juror would believe that after a patron suffered a severe injury on the restaurant's premises, its managers would fail to complete a report documenting the incident and gather the specifics as to what happened. Defendants' explanation for the missing incident report is incredulous and if offered would likely have hurt rather than helped the defense.

However, even if giving the adverse inference charge was error, it was harmless, and did not lead "to an unjust result."  Willner v. Vertical Reality, Inc., 235 N.J. 65, 79 (2018).  The trial judge gave the adverse inference charge, but the jury was free "to accept or reject the inference."  Davis, 424 N.J. Super. at 148.

## C.

We next address defendants' argument that the trial judge erred in allowing plaintiff's experts—particularly Dr. Kezmarsky—to testify based on plaintiff's hearsay statements, which they claim "were allowed to be dressed up in expert garb and used as 'evidence' while shielding her from cross-examination."  Defendants raised similar arguments pretrial before the motion judge as we stated previously:  they moved to bar Dr. Kezmarsky's testimony as an impermissible net opinion, asserting she merely parroted plaintiff's subjective

A-0539-22

complaints, and also moved to exclude statements made by plaintiff or Jasmine to Doctors Berman, Cash, and Wolstein, as hearsay.

The motion judge denied defendants' motion as to Dr. Kezmarsky, concluding her expert report "is grounded in 'facts or data' as required by [N.J.R.E.] 703," and included biofeedback testing results, intelligence testing, and interviews of plaintiff and Jasmine. In rejecting defendants' argument, the motion judge found Dr. Kezmarsky was essentially functioning as a treating physician, and thus, statements made to her by plaintiff and Jasmine were admissible under N.J.R.E. 803(c)(4). The motion judge concluded:

> To bar expert testimony as to the subject matter of an interview of an individual such as [plaintiff] conducted by a medical or other professional is to overlook the fact that individuals suffering from severe disabilities seek and obtain medical treatment and interact with such professionals for the purpose of securing the same and to conclude in effect such professionals are unable to use the information from interviews of such individuals properly for purposes of rendering professional judgments.

The motion judge stated defendants could ask the trial judge for a N.J.R.E. 104 hearing as to Dr. Kezmarsky's opinions, but they never did. Regarding Doctors Berman, Cash, and Wolstein, the motion judge found their testimony as to statements made by plaintiff or Jasmine in interviews they conducted "are not

barred as hearsay" because such statements form a portion of the facts or data upon which experts rely on their opinions as permitted by N.J.R.E. 703.

The admissibility of expert opinion is guided by N.J.R.E. 702 and 703 and the net opinion rule. N.J.R.E. 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." In turn, N.J.R.E. 703 contemplates that an expert's opinion must be founded on "facts or data." Hisenaj v. Kuehner, 194 N.J. 6, 24 (2008); accord Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 3 on N.J.R.E. 703 (2023-24).

In Davis v. Brickman Landscaping, Ltd., 219 N.J. 395 (2014), our Court elaborated on the parameters of the net opinion rule and the factors to be employed when applying it.

> An expert may not provide an opinion at trial that constitutes "mere net opinion." Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011). The rule prohibiting net opinions is a corollary of New Jersey Rule of Evidence 703, State v. Townsend, 186 N.J. 473, 494 (2006), which provides that an expert's testimony "may be based on facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence

but which is the type of data normally relied upon by experts in forming opinions on the same subject," Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 703 (2014). Thus, the net opinion rule can be considered a "restatement of the established rule that an expert's bare conclusions, unsupported by factual evidence, [are] inadmissible." Buckelew [v. Grossbard, 87 N.J. 512, 524 (1981)].

The net opinion rule "requires that the expert 'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Pomerantz Paper Corp., 207 N.J. at 372 (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)). For example, "a trial court may not rely on expert testimony that lacks an appropriate factual foundation and fails to establish the existence of any standard about which the expert testified." Id. at 373. Therefore, an expert offers an inadmissible net opinion if he or she "cannot offer objective support for his or her opinions, but testifies only to a view about a standard that is 'personal.'" Ibid.

[Id. at 410.]

"Expert testimony should not be received if it appears the witness is not in possession of such facts as will enable him [or her] to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture." Vuocolo v. Diamond Shamrock Chems. Co., 240 N.J. Super. 289, 299 (App. Div. 1990).

On appeal, defendants primarily argue that Dr. Kezmarsky's expert testimony was improper and should have been barred under N.J.R.E. 702 and 703 because her opinion was not supported by adequate facts and simply

"parroted" plaintiff's subjective complaints of fear under the guise of an expert opinion. We discern no abuse of discretion in allowing Dr. Kezmarsky's testimony.

Our Court has noted that "any medical examination, whether physical or psychiatric, must begin with the subjective statement of the patient . . . ." Saunderlin v. E.I. Du Pont Co., 102 N.J. 402, 412 (1986). Our Court warned against requiring "physical manifestations 'observable' and 'measurable'" of psychological injury. Id. at 415. Yet, "in no event will a medical doctor's mere 'parroting' of the patient's statement be sufficient." Id. at 416.

Here, Dr. Kezmarsky did not merely "parrot" plaintiff's subjective complaints, explaining the sources she relied on to reach her conclusions, such as the attempted biofeedback therapy on plaintiff and completed IQ testing. The interviews, in combination with plaintiff's inability to withstand biofeedback therapy and IQ scores, led Dr. Kezmarsky to conclude plaintiff's fear and anxiety were due to the slip and fall accident and that her fear was "permanent" in nature. Townsend, 221 N.J. at 553. We agree with the trial judge that Dr. Kezmarsky's opinion constituted proper expert opinion under N.J.R.E. 702 and 703.

We are also convinced Dr. Kezmarsky did not render a net opinion. Given plaintiff's limited intellectual ability, Dr. Kezmarsky opined plaintiff could not

respond to therapy and does not "have the capacity" to "problem solve" her fear based on her interviews and testimony, and supported her conclusions with "the why and wherefore." Townsend, 221 N.J. at 554. Moreover, Dr. Kezmarsky first interviewed plaintiff as a treating psychologist in an effort to alleviate her fears and anxiety since the fall. Such statements were not hearsay under N.J.R.E. 803(c)(4) because the statements were "made in good faith for purposes of . . . medical diagnosis or treatment; and . . . describe[] medical history; past or present symptoms or sensations; their inception; or their general cause."

The same holds true of Doctors Berman, Cash, and Wolstein. Defendants similarly argue that these experts detailed plaintiff's subjective complaints of fear, which were not relevant to their testimony, and constituted improper hearsay. Again, these statements are not barred as hearsay under N.J.R.E. 703, as they formed the basis for their opinions. Each of these experts interviewed and examined plaintiff and reviewed medical records in reaching their opinions, which was well within their purview under N.J.R.E. 703. See also James v. Ruiz, 440 N.J. Super. 45, 65 (App. Div. 2005).

We discern no abuse of discretion in allowing plaintiff's experts to testify about her subjective complaints of fear. Absent expert testimony, plaintiff could

not adequately prove the damages she suffered in the past and will suffer in the future.  Thus, we reject defendants' argument.

D.

Next, defendants argue the trial judge erred in allowing plaintiff to read Carpenito's December 7, 2015 statement to the jury.  Defendants contend plaintiff failed to disclose an intention to use the statement pretrial, and the use of the statement was an unfair surprise.  Plaintiff counters the statement was known to defendants before trial, and there was no error.  We are unpersuaded by defendants' argument.

The motion judge did not complete his in camera review or rule on whether plaintiff was entitled to Carpenito's June 9, 2016 statement until several days into the trial.  Indeed, at the commencement of trial, plaintiff alerted the trial judge that the parties were still awaiting the motion judge's decision on this issue.  On September 16, 2022, mid-trial, the motion judge ruled on defendants' reconsideration motion and denied plaintiff's request to compel disclosure of Carpenito's June 9, 2016 statement.  Because the motion judge found "no material inconsistencies between these statements," he held "there is no basis drawn from comparison of the two statements to warrant disclosure" of the latter statement.

A-0539-22

Upon reviewing that ruling, plaintiff immediately moved in limine to admit Carpenito's December 7, 2015 handwritten statement under N.J.R.E. 804(b)(6). Plaintiff argued Carpenito's December 7, 2015 statement was trustworthy and made in good faith, as it was consistent with Iuspa's testimony and her June 9, 2016 statement, as determined by the motion judge. Defendants opposed the motion on the basis it was "highly prejudicial" to use the December 7, 2015 statement at trial.

The trial judge noted "[a]rguably, that was a mistake" and found plaintiff's explanation "more than quite understandable." The trial judge granted plaintiff's motion to admit Carpenito's December 7, 2015 statement into evidence pursuant to N.J.R.E. 804(b)(6), with certain redactions, ruling it was "highly relevant" and "on balance, the probative value exceeds the prejudice." Regarding defendants' argument the statement was an unfair surprise, the trial judge determined "[t]here's nothing that could have been done . . . by . . . defendant[s] that would have made any difference had defendant[s] been aware of the intention to introduce this document . . . I think [Carpenito] says nothing different than the witness who testified on the stand, Iuspa."

Hearsay is defined as "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence

to prove the truth of the matter asserted." N.J.R.E. 801(c). Hearsay is presumptively inadmissible unless an exception applies. N.J.R.E. 802. N.J.R.E. 804(b)(6) provides an exception to the hearsay rule in civil cases, allowing into evidence "a statement made by a person unavailable as a witness because of death if the statement was made in good faith upon declarant's personal knowledge in circumstances indicating that it is trustworthy." There are four requirements to qualify for this exception:

> (1) the declarant must be dead; (2) the statement must have been made in good faith; (3) the statement must have been made upon the declarant's own personal knowledge; and (4) there must be a probability from the circumstances that the statement is trustworthy.
>
> [Est. of Grieco v. Schmidt, 440 N.J. Super. 557, 564 (App. Div. 2015) (quoting DeVito v. Sheeran, 165 N.J. 167, 194 (2000)).]

"The court need find only a probability that the statement is trustworthy from the flavor of the surrounding circumstances. The determination is a subjective one." Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 380 (2010). We have noted N.J.R.E. 804(b)(6) "does not include a corroboration requirement." Est. of Grieco, 440 N.J. Super. at 566.

Defendants do not argue the court improperly admitted the statement pursuant to N.J.R.E. 804(b)(6), but instead argue the statement should have been

excluded because it was unfair surprise. They claim it was an unfair surprise because plaintiff did not include Carpenito's December 7, 2015 statement in her Pretrial Exchange Information pursuant to Rule 4:25-7(b).

Rule 4:25-7(b) provides that "in cases that have not been pretried, attorneys shall confer and, seven days prior to the initial trial date, exchange the pretrial information as prescribed by Appendix XXIII to these rules." Appendix XXIII provides that parties must provide to opposing counsel "[a] list of all witnesses . . . to be called in the party's case in chief"; "[a] list of all exhibits to be offered in the party's case in chief"; "[a] list of any proposed deposition or interrogatory reading(s) by page and line number or by question number"; "[a]ny in limine or trial motions intended to be made at the commencement of trial"; and "[a] list of all anticipated problems with regard to the introduction of evidence in each party's case in chief . . . ." Pretrial Information Exchange, Pressler & Verniero, Current N.J. Court Rules, Appendix XXIII to R. 4:25-7(b), www.gannlaw.com (2024). The "[f]ailure to exchange and submit all the information required by [Rule 4:25-7(b)] may result in sanctions as determined by the trial judge." R. 4:25-7(b).

Our courts have noted these pretrial rules and requirements exist for "[t]he obvious purpose . . . to promote fair advocacy and to discourage gamesmanship

or unfair surprise at trial." Rice v. Miller, 455 N.J. Super. 90, 105 (App. Div. 2018). "Unfair surprise is a proper basis to exclude evidence not properly provided to the opposing party during discovery." Hayes v. Delamotte, 231 N.J. 373, 391 (2018). "The prohibition against unfair surprise prevents the introduction of evidence not properly disclosed by the opposing party, . . . but does not prevent counsel from using to their strategic advantage the evidence properly presented at trial . . . ." Ibid.

We are satisfied the trial judge did not abuse his discretion by admitting the December 7, 2015 statement pursuant to N.J.R.E. 804(b)(6). Rowe, 239 N.J. at 551. The statement meets all four requirements to the hearsay exception. Est. of Grieco, 440 N.J. Super. at 564. Carpenito is deceased, as plaintiff provided her obituary as an exhibit to the motion in limine. Carpenito's statement was made based upon her personal knowledge, as one of the questions on the questionnaire, which was admitted into evidence, asked if she witnessed the accident, to which she wrote "Yes." Further, the statement was both made in good faith and likely trustworthy given the circumstances. Ibid.

Carpenito filled out plaintiff's questionnaire and gave a statement of her own free will, noting in her responses that she did not know any of the people involved in the accident, but "was only familiar with who [plaintiff] was."

Moreover, there is no indication from the statement, or from the record, that Carpenito had any reason to be untruthful, and clearly was not trying to aid plaintiff as a friend, as Carpenito stated she did not know her well.

Saliently, Carpenito's statement that "Rose (plaintiff) got up and stepped on the dance floor [and] immediately slipped on something on the floor [and] fell immediately," was consistent with Iuspa—plaintiff's eyewitness—who also testified he saw plaintiff "t[ake] a few steps from where she was . . . to the dance floor and she stepped on [something] and . . . fell pretty hard." He thought plaintiff had fallen on a "grape" or "some melon" that "was squashed" on the dance floor, consistent with Carpenito's statement that there was "food possibly, squashed on the floor." Also, Carpenito's December 7, 2015 statement had, according to the motion judge, "no material inconsistencies" with her June 9, 2016 statement, which supports the notion that her account is both trustworthy and made in good faith. Ibid.; Beckwith, 185 N.J. Super. at 63.

In light of the circumstances surrounding the admission of Carpenito's December 7, 2015 statement at trial, there was no unfair surprise to defendants. In defendants' brief in opposition to plaintiff's motion to compel filed in 2018, defendants acknowledged that plaintiff's former counsel "forwarded" the statement "[b]y email dated December 11, 2015" to their insurer. Although

Carpenito was not listed by plaintiff as a witness in her Pretrial Information Exchange, plaintiff was not calling Carpenito as a live witness due to her demise but stated a motion in limine would be filed based "on her unavailability." And, the motion judge had not ruled on defendants' motion for reconsideration relative to Carpenito's June 9, 2016 statement until the trial was in progress. Therefore, plaintiff did not have a reason to move in limine until after the ruling was made.

As recognized by the trial judge, plaintiff would not have known whether the December 7, 2015 statement was consistent with the June 9, 2016 statement until the motion judge conducted an in camera review and issued a ruling. This is not the "gamesmanship" that our pretrial rules were created to discourage. Rice, 455 N.J. Super. at 105. We conclude the trial judge did not abuse his discretion, no "manifest denial of justice resulted" in admitting the December 7, 2015 statement under N.J.R.E. 804(b)(6), and there was no unfair surprise to defendants. Rowe, 239 N.J. at 551 (quoting Griffin, 225 N.J. at 413).

E.

Defendants next argue the trial judge erred in barring deposition testimony of Maria regarding plaintiff's SSD status from being admitted at trial. Defendants aver plaintiff's disability status is relevant on the issue of damages

and supports a finding that she was unable to be employed long before the accident. We disagree.

At her deposition, Maria testified that plaintiff qualified for SSD sometime in her twenties. Plaintiff moved to exclude that portion of Maria's testimony on the grounds it would confuse the jury that social security can pay for plaintiff's care in the future. In opposition, defendants argued the testimony was relevant because the jury was told that plaintiff is developmentally disabled, and the degree of her disability and whether the accident aggravated her condition, is a condition for the jury to decide.

The trial judge excluded the testimony, reasoning the mother's testimony on the SSD issue was " a vague response" and had "no substance, no basis," and "could very easily confuse the jury . . . without more." We discern no abuse of discretion in barring the testimony.

Generally speaking, "a [Social Security Administration (SSA)] determination is hearsay . . . ." Villanueva v. Zimmer, 431 N.J. Super. 301, 313 (App. Div. 2013). "The only hearsay exception that might apply" to a social security disability determination "is the 'public records exception' under N.J.R.E. 803(c)(8)." Ibid. Under that exception, a party seeking to admit a hearsay statement must demonstrate that it is either:

44

(A) a statement contained in a writing made by a public official of an act done by the official or an act, condition, or event observed by the official if it was within the scope of the official's duty either to perform the act reported or to observe the act, condition, or event reported and to make the written statement; or (B) statistical findings of a public official based upon a report of or an investigation of acts, conditions, or events, if it was within the scope of the official's duty to make such statistical findings.

[N.J.R.E. 803(c)(8).]

However, we have stated that "N.J.R.E. 803(c)(8) does not authorize the admission of an SSA determination of disability as a hearsay exception . . . ." Id. at 317. Further, "[a]n SSA disability determination is of dubious probative value in a personal injury action" because "[t]he lack of a meaningful adversarial process with respect to the cause, existence, and extent of a plaintiff's alleged disability renders the SSA's conclusions on that issue unreliable." Id. at 318.

Defendants' proffer was plaintiff's SSD status would have shown that she was unable to work before the fall and thus, her damages should be lower. But plaintiff did not make a claim for lost wages. Moreover, the jury heard uncontroverted testimony from Maria and Jasmine that plaintiff never had a paying job but only did volunteer work. In addition, Dr. Wolstein testified that the estimates he gave for plaintiff's twenty-four-hour future care only accounted for future medical costs stemming from her injury and were not related to those

45

she would incur based on her preexisting disability.  Therefore, we conclude plaintiff's SSD status is irrelevant and improper hearsay.  See Id. at 317.  The trial judge did not abuse his discretion in excluding Maria's testimony about plaintiff's SSD status.

## F.

Finally, defendants argue that the jury verdict sheet was confusing because the trial judge failed to delineate between ordinary negligence and mode-of-operation theories of premises liability.  At the charge conference, defendants conceded that there was a "potential factual nexus" for a mode-of-operation charge "based upon the plaintiff's theory of the case."  However, defendants argued that the jury should be instructed on only the mode-of-operation theory rather than ordinary negligence because plaintiff had not established that defendants had notice of the food on the floor on which she allegedly slipped.

Plaintiff countered the jury should also be charged on ordinary negligence because it is reasonable for the jury to conclude that food was on the floor "for an unreasonable period of time and [defendants] had constructive notice of it, they just didn't see it."  The trial judge agreed, noting "even if the jury for some

reason doesn't want to buy mode[-]of[-]operation, [it] can still find liability because of constructive notice of . . . a dangerous condition."

The mode-of-operation doctrine creates an inference of negligence which excuses a plaintiff from having to prove notice and shifts the burden to defendant to show it exercised due care. Prioleau, 223 N.J. at 263. The Prioleau Court clarified "the mode-of-operation [doctrine] is not a general rule of premises liability, but [rather] a special application of foreseeability principles in recognition of the extraordinary risks that arise when a defendant chooses a customer self-service business model." Id. at 262.

Principles which apply when a business allows customers to handle products and equipment, unsupervised by employees, due to the increased risk "that a dangerous condition will go undetected and that patrons will be injured." Ibid. While "the mode-of-operation doctrine has never been expanded beyond the self-service setting," such a setting encompasses where customers "may come into direct contact with product displays, shelving, packaging and other aspects of the facility that may present a risk." Ibid. (citing Nisivoccia v. Glass Gardens, Inc., 175 N.J. 559, 563-66 (2003)).

Here, defendants argue the trial judge erred by charging the jury on both ordinary negligence and mode-of-operation. The trial judge instructed the jury

on all elements of negligence, including in the context of premises liability and gave instructions on both actual and constructive notice. The trial judge also charged the jury on mode-of-operation, stating:

> In self-service settings, patrons may be at risk for injury from the manner in which the business employees handle the business's products or equipment or from the inherent quality of the merchandise itself.
>
> If you find the plaintiff has proven that the defendants' business was being operated as a self-service operation, that the plaintiff's accident occurred in an area affected by the business's self-service operation, and that there is a reasonable factual nexus between the defendants' self-service activity and the dangerous condition allegedly producing the plaintiff's injury, then the plaintiff is relieved from the burden of proving that . . . defendants had actual or constructive knowledge of the particular dangerous condition.
>
> In such circumstances, an inference of negligence arise[s] that shifts the burden to the defendant to produce evidence that it did all that a reasonably prudent business would do in the light of the risk of injury . . . that the self-service operation presents.
>
> To reiterate, you cannot hold . . . defendant, [The] Hanover Manor, liab[le] under the mode-of-operation rule unless you are persuaded by a preponderance of the evidence that the plaintiff slipped on a substance that came from the self-service buffet.

The verdict sheet used at trial asked:[6]

1. Was the [d]efendant negligent and its negligence a proximate cause of the accident?

YES____ NO____ VOTE____

If "YES," proceed to question 2.

If "NO," you have completed your deliberations.

2. Was the [p]laintiff negligent and her negligence a proximate cause of the accident?

YES____ NO____ VOTE____

If "YES," please determine what percentage of such total negligence is attributable to [d]efendant and [p]laintiff (taking the combined negligence of all parties to this lawsuit as being 100%)

a. Defendant      Answer____

b. Plaintiff      Answer____

TOTAL 100%      VOTE_____

If [p]laintiff's total negligence is 50% or more, you have completed your deliberations.

If "NO," or if [p]laintiff's total negligence is less than 50%, proceed to question 3.

3. State whether [p]laintiff has proven by a preponderance of the evidence that she suffered an

---

[6] The actual verdict sheet marked by the jury is not included in the record, only plaintiff's proposed verdict sheet, which the trial judge adopted.

injury proximately caused by [d]efendant's negligence on May 3, 2015?

YES____ NO____ VOTE____

If "YES," proceed to question 4.

If "NO," you have completed your deliberations.

4. What sum of money will fairly, fully, and reasonably compensate [p]laintiff Rosemarie Pietrobon for her harms and losses proximately caused by [d]efendant's negligence on May 3, 2015? Fill out each line:

(a) future medical expenses $_____ VOTE_____

(b) past and future pain and suffering, disability, impairment and loss of enjoyment of life $_____ VOTE_____

Our Court has "recognize[d] the importance of the verdict sheet as 'an essential component' of the trial court's 'road map' for the jury's deliberations." State v. Cuff, 239 N.J. 321, 340 (2019) (quoting State v. Galicia, 210 N.J. 364, 387 (2012)); see also N.Y.-Conn. Dev. Corp. v. Blinds-To-Go (U.S.) Inc., 449 N.J. Super. 542, 557 (App. Div. 2017). "Jurors are likely to refer, and refer often, to the directions on the verdict form." Cuff, 239 N.J. at 340 (quoting State v. Nelson, 173 N.J. 417, 449 (2002)). "Thus, 'we encourage completeness and consistency in the preparation of verdict sheets.'" Id. at 340-41 (quoting State v. Gandhi, 201 N.J. 161, 198 (2010)).

50

"Because a verdict sheet constitutes part of the trial court's direction to the jury, defects in the verdict sheet are reviewed on appeal under the same 'unjust result' standard of Rule 2:10-2 that governs errors in the jury charge." Galicia, 210 N.J. at 388. "The failure to provide clear and correct jury charges and instructions on the verdict sheet is error . . . ." N.Y.-Conn. Dev. Corp., 449 N.J. Super. at 557. However, because the jury instructions "serve as the jury's primary guide as it considers the charges and the evidence," errors in a verdict sheet can be regarded as harmless unless the verdict sheet was misleading. Cuff, 239 N.J. at 341; see also Galicia, 210 N.J. at 387 ("When there is an error in the verdict sheet, but the trial court's charge has clarified the legal standard for the jury to follow, the error may be deemed harmless.").

At the outset, to the extent defendants challenge the charge itself, they have waived that issue by not briefing it. See Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) ("An issue not briefed on appeal is deemed waived."). Nonetheless, we conclude the trial judge properly charged the jury as to mode-of-operation in accordance with Walker v. Costco Wholesale Warehouse, 445 N.J. Super. 111, 121 (App. Div. 2016).

Walker, which involved a slip and fall allegedly caused by free cheesecake samples at Costco, provides that, when mode-of-operation is applicable, the trial

court "shall include with the model charge a specific instruction advising the jurors that they cannot hold [defendant] liable under a mode-of-operation theory unless they find that plaintiff has persuaded them by a preponderance of the evidence that he slipped on a substance that came from the stand with the free samples." Ibid.

That is exactly what the trial judge did here—he tailored the Model Jury Charge to ensure the jurors understood they had to find a factual nexus between plaintiff's injury and the self-service buffet to find defendants liable under mode-of-operation, even emphasizing, "[t]o reiterate, you cannot hold the defendant, [The] Hanover Manor, liab[le] under the mode-of-operation rule unless you are persuaded by a preponderance of the evidence that . . . plaintiff slipped on a substance that came from the self-service buffet." It is presumed the jurors understood that instruction and gave their verdict accordingly. See Gandhi, 201 N.J. at 197 (noting the jury is presumed to have understood the judge's instructions). For these reasons, the trial judge did not err in charging the jury. Walker, 445 N.J. Super. at 128.

Further, the verdict sheet was not inadequate or misleading. Defendants maintain Walker mandates that a trial court must specifically pose questions as to mode-of-operation on the verdict sheet. However, there is nothing in Walker

that supports that theory. <u>Walker</u> mandates that, if a mode-of-operation theory of liability is applicable, the jury be charged that, to hold the defendant liable under that theory, it must find a factual nexus exists between the dangerous condition allegedly leading to plaintiff's injury and defendant's self-service component. <u>Ibid.</u> <u>Walker</u> does not mandate that instruction be given on the verdict sheet, or require special interrogatories as to mode-of-operation be posed on the verdict sheet. <u>Ibid.</u> And, the jury verdict sheet did not have to specify which theory it found defendants negligent under. In sum, we conclude the verdict sheet was not inadequate or misleading.

To the extent we have not addressed any arguments raised by defendants, they lack sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0539-22